STATE OF IOWA v. GUY BAKER, Appellant.

**Criminal law:** JURORS: COMPETENCY: WAIVER OF OBJECTION. The mere fact that a defendant in a criminal case may have talked with one of the jurors who was confined in the jail with him would not render the juror incompetent, unless he received some information or impressions tending to bias his judgment and prejudice him against the accused; and if such was the fact and it was discovered during the trial, it was the duty of the defendant to make the objection then, rather than speculate on a favorable verdict and in the event of disappointment insist upon the juror's incompetency as the basis of a. motion for new trial.

**Same.** The fact that after the jury had agreed upon a verdict of guilty and were waiting for the judge to deliver the same to him, one of the jurors suggested that defendant was of the same name as a person reported to have committed a previous murder, was not ground for new trial, in the absence of evidence that any juror was influenced by the suggestion, or that the verdict as prepared would have been repudiated by any member of the panel.

**Same:** EVIDENCE: PHOTOGRAPHS. Photographs of the surroundings of the place where a crime was committed are admissible in evidence, when the surroundings are material; and although the photographer was permitted to speak of a certain point in connection with the

photograph as the place where the crime was committed, it was not prejudicial to the defendant, where it was conceded that he had no personal knowledge of the fact and it was clear from his testimony that he referred simply to the place as pointed out to him.

**Same:** EVIDENCE OF REPUTATION : COMPETENCY OF WITNESS. Witnesses acquainted with the reputation of a defendant for truth and veracity in his own neighborhood may testify to the same, although they may reside elsewhere; the fact that they reside elsewhere going simply to the weight to be given their evidence.

**Same:** EXPERT EVIDENCE : CONCLUSION. Where it was shown without dispute that defendant struck deceased with a stick, thus crushing his skull and producing death, a physician called to the relief of deceased immediately after the injury could properly state that the blow was a severe one, and his statement was not an invasion of the province of the jury or prejudicial to the defendant.

**Same.** As indicated by the appearance of a wound upon the head, a physician may state the nature of the instrument with which it was inflicted; and if more than one wound he may state that the other was the probable result of a second blow, even though there was no other evidence that more than one blow was struck.

**Same:** IMMATERIAL EVIDENCE. The admission of immaterial evidence not reasonably calculated to mislead the jury or affect its verdict is not ground for reversal.

**Same:** MURDER : INSTRUCTIONS : SELF-DEFENSE. An instruction that the danger justifying a killing in self-defense need not be real, but such as to lead a reasonably prudent man to believe in its reality, and in estimating the imminence of the danger and means of avoiding it, or of the force necessary to repel it, the excitement and confusion of the surrounding circumstances must be considered, and the person threatened is not held to the same deliberate judgment as a person unaffected by danger, but should be judged only as a reasonably prudent man under the peculiar circumstances, was as favorable to defendant as the instruction requested and refused by the court in the instant case, except as to the erroneous statement to be inferred from the requested instruction that the right of self-defense exists between men engaged in mere quarreling or controversy.

**Same.** Although a paragraph of the court's instructions on the subject of self-defense, if standing alone, would erroneously permit the jury to go back to the beginning of the quarrel and consider who was right on the question over which the controversy originally arose, still if construed in connection with other parts of the charge immediately associated therewith it was clear that such

was not the intent or meaning of the instruction as a whole it will not be held erroneous.

**Same:** INSTRUCTIONS: DUTY TO RETREAT. Where the court's instructions as a whole relating to the duty of a person assaulted to retreat are a correct statement of the law, and clearly embody the rule of a requested instruction, a refusal of the request is not erroneous.

**Same:** INSTRUCTIONS: SELF-DEFENSE. The right of self-defense involves the right to kill under certain circumstances; and where the defense was based upon the right to take the life of the alleged assailant, use by the court of the term "right to kill" in its instructions relative to the law of self-defense, was not prejudicial because placing the defendant in the unfavorable attitude of contending for the right to take life, rather than the mere right to defend himself by the use of adequate force.

**Same:** INSTRUCTIONS: MALICE. Malice essential to the crime of murder is such anger and ill will as indicates a wicked and corrupt intent, a condition of heart and mind having no regard for social or moral obligations; mere anger or ill will unaccompanied by any thought of doing bodily harm to him who is the object of dislike is not sufficient. The court's instructions in the instant case, when considered as a whole, are not subject to the objection that they permitted a finding of murder if defendant was merely angry when he struck the fatal blow.

**Same:** INSTRUCTIONS: ASSAULT. Where the court in its instructions sufficiently included the elements of an assault, and charged the jury that if defendant was attacked by deceased he could lawfully defend himself by force reasonably proportionate to his peril, even to the taking of life if reasonably apprehensive that his own life was in danger, a more technical definition of assault in such cases was not required, in the absence of a request therefor.

**Same:** SELF-DEFENSE: EVIDENCE. One may rightfully expel a person from his premises and forbid him to re-enter; but having expelled him he should cease the use of force and permit the intruder to depart, unless instead of departing the intruder is still seeking an opportunity to do bodily injury, and then there is no obligation to retire at the risk of a vicious assault. Under the evidence in the instant case the question of whether the defendant was in such real or apparent peril as to justify an extreme measure of self-defense was for the jury.

*Appeal from Johnson District Court.*—Hon. R. P. Howell, Judge.

TUESDAY, MAY 7, 1912.

THE defendant was indicted for the alleged murder of Oliver P. Driver. To this charge he pleaded not guilty, and upon the trial was convicted of murder in the second degree. From the judgment entered on this verdict he appeals. The material facts are stated in the opinion.— *Affirmed.*

*Wade, Dutcher & Davis,* for appellant.

*George Cosson,* Attorney General, *John Fletcher,* Assistant Attorney General, and *C. S. Ranck,* for the state.

WEAVER, J.—Appellant lived on a farm in Johnson county; but owned a livery stable in the town of Lone Tree in the management of which he employed Oliver P. Driver, the deceased. On the 13th day of June, 1910, appellant came to Lone Tree, and while at the barn with Driver, no other person being immediately present, a quarrel or angry dispute arose between them. They were seen to emerge from the front door of the barn into the street; Driver, who was considerably the lighter man of the two, backing or (as some of the witnesses express it) "sidestepping" away toward the middle of the street, the appellant following him up in an angry or threatening manner, until, at a point variously estimated at from fifteen to twenty-five feet from the barn, appellant, suddenly stooping, caught up a stick or piece of board lying on the ground, and struck Driver an overhand blow upon the head, breaking his skull, and inflicting an injury from which death soon ensued. The movements and conduct of the parties from their exit from the barn to the striking of the blow which terminated their quarrel were observed by several witnesses, none, however, being sufficiently near to interfere or to understand

clearly the nature of the controversy between the contending parties. So far as these witnesses observed neither appellant nor Driver was armed with any weapon up to the moment when appellant caught up the board, but it is the theory of the defense, and appellant as a witness swears, that as they came out of the barn Driver drew from his pocket a knife, and opened it, threatening to disembowel appellant, who, believing that Driver in side-stepping and backing away was seeking an opportunity to rush in upon him and carry out said threat, picked up the stick, and dealt the blow in self-defense and without malice. As to the fact that Driver did have a knife in his hand, there is more or less testimony corroborating the appellant's statement. In argument in this court counsel concede the fact that Driver died from the blow inflicted by appellant, but it is contended with much force and earnestness that the killing was not felonious, and the verdict of guilty cannot be sustained upon the record.

The errors assigned are too numerous to permit their separate consideration within the reasonable limits of a written opinion, and we shall confine our discussion to those which seem to be of controlling importance.

I. One Regan was drawn to serve as a juror for the trial of the case. Upon his examination for cause, Regan stated that he knew appellant, and had met him in the jail soon after his arrest. Being asked if he

1. CRIMINAL LAW: jurors: competency: waiver of objection.

went to the jail on purpose to see appellant, he answered: "Well, not exactly. I was just looking through over there. I didn't go exactly to see him. He was there when I went. I didn't know he was in there at the time even. Mere curiosity took me there. Talked with Baker a few minutes. He did not tell me how the fight occurred. Did not talk with him about the trouble. Didn't hear anything about the case when I was there." This juror was passed by both prosecution and defense, and served upon the trial panel.

After the verdict was returned appellant assigned as one of his grounds for a new trial the fact that Regan, instead of being a casual visitor at the jail where appellant was confined, was, in fact, at that time an inmate there, with whom and in whose presence appellant had frequently talked of the affray and the facts attendant upon the killing of Driver. In explanation of the fact that he did not raise the objection when the juror was under examination, appellant says that the change in Regan's clothing and appearance was such that he did not recognize him until after the jury had been sworn and the trial was in progress.

It is argued that the concealment of the truth as to the fact of the juror's confinement in the jail at that time was a fraud upon the defendant and upon the court, which should be held to vitiate the verdict. We think this exception can not be sustained. The inquiry into the reason for the juror's presence at the jail where he saw the appellant was incidental only to the ultimate question of his impartiality and fairness of mind as between the state and the accused. Whatever may have been the true explanation of his presence there, it had no material bearing upon his competency as a juror, if as a matter of fact he was not there exposed to influences, or did not there obtain information or receive impressions, tending to bias his judgement to the prejudice of the appellant. The juror himself swears that he did not then know or hear anything about the case, and had no conversation upon the subject with appellant. True, the latter denies this statement, and says that he did talk with the juror and in his presence concerning the killing and the circumstances thereof. We doubt whether upon such a conflict of testimony, and with no other showing as to the circumstances, the trial court would have been justified in disturbing the verdict. Even upon appellant's own testimony there is no showing what particular things were said to or in the presence of the juror, and the court is in effect asked to presume that

whatever it may have been it was calculated to work to the appellant's prejudice in the mind of Regan when acting as a juror.

Moreover, it appears from appellant's statement that he discovered the identity of the juror as a fellow inmate of the jail while the trial was in progress, but no action was taken thereon until after verdict had been returned. The objection was therefore untimely, and must be held to have been waived. Had he deemed the objection a vital one, it was his privilege to announce the discovery to the court, and demand an entry of mistrial or the impanelment of another jury. He could not rightfully speculate upon the hope of a favorable verdict from the objectionable juror reserving the right in the event of disappointment to insist upon the incompetence of that juror as a ground for a new trial. *Foedisch v. Railroad Co.,* 100 Iowa, 728.

II. It is further charged that one of the jurors claimed to have knowledge that the appellant at some time in the past had killed a man in the city of Muscatine, and that such juror made the statement to the rest of the panel during the consideration

2. SAME.

of the case. The only evidence offered in support of this charge tends to show that after their verdict had been agreed upon and duly signed, and while waiting for the trial judge to be called to the courtroom to receive such verdict, one juror asked another if the defendant was not the person of the same name who was said at some former time to have killed a man in Muscatine, and was answered in the affirmative, and that this statement was in the presence of some or all of the panel. Taking the testimony as a whole, we are disposed to hold that it not only fails to show prejudice to the defendant, but distinctly tends to rebut any inference of the kind. The jury had agreed, the verdict had been prepared ready for delivery, and while it was, of course, possible for any juror to still change his mind, there is no suggestion on the part of any juror that

he was in any manner or degree impressed or influenced by this bit of gossip, or that, in the absence thereof, the verdict already prepared would have been repudiated by any member of the panel. The demand for a new trial based on this incident can not be sustained.

III.  It is the theory of the defense that the trouble between the appellant and Driver on the day of the homicide had its origin, in part at least, over the fact that a lap robe belonging to the stable was missing, and that appellant charged Driver with stealing it, and insisted that he return it. Appellant says that, while still in the barn, he made the accusation above mentioned, and thereupon Driver ordered him to leave. Angry words followed, and, according to his statement, the parties assumed a more or less menacing attitude toward each other, and in stepping around they gradually approached and passed out of the door. As they were passing out, he says Driver drew and opened a knife, threatening to strike him with it, and that their proximity to each other was such that appellant could not turn or retreat without giving Driver opportunity to carry out his threat. This movement it is contended did not carry them more than twelve or fifteen feet from the barn door, and it was at this point the fatal blow was delivered. The theory of the state is that Driver was not armed with a knife or other weapon; that being much the smaller man, he was retreating or backing away from appellant, who pursued him viciously to a point twenty-five feet or more from the door, where appellant with malice, and not in self-defense, struck him down. The distance of this point from the door of the barn, whether twelve or twenty-five feet, is a matter of some importance in two respects. In the first place, the distance has some bearing on the question whether appellant was pursuing Driver with the purpose of doing him an injury, or was circling about facing Driver for the lawful purpose of repelling an

3. SAME: evidence: photographs.

assault, and protecting himself from injury. It is further
of importance from the fact that a witness for the state
who was on the porch or at the window of a house standing
by the side of the barn testifies that she saw the parties as
they came out and saw the blow struck. If the point where
this occurred was not more than fifteen feet from the door,
then, according to the defense, it would have been a physical
impossibility for the witness standing at the place fixed by
her to see the parties to the affray or to have personal
knowledge of the things to which she swears. If, however,
the point in question was twenty-five feet from the door,
then there would be no substantial obstruction to her view.

Soon after the homicide, a photographer, at the instance
of the state, took a series of photographic views, placing
his instrument at the several places occupied by the wit-
nesses of the affray, and focusing the camera upon the
spot twenty-five feet from the barn door where the pro-
secution claims Driver was struck down. Other views were
taken placing the instrument at the last-named spot, and
directing it upon the several localities occupied by the
witnesses. These views were identified and admitted in
evidence over the objection of the defense. Error is as-
signed upon this ruling. It is complained that the photo-
grapher was permitted to speak of the spot twenty-five
feet from the door as "the place where Driver fell," when
it was conceded by all parties that he had no knowledge of
the fact, except as he had been told by others. It is true
that the witness made use of the expression criticised, but,
giving a fair statement of his testimony, it is perfectly
clear that he meant no more, nor could any juror of aver-
age intelligence have understood him as meaning any more,
than that this was the spot pointed out to him as the place
where Driver fell, and that the photographs were taken to
illustrate that particular spot and its surroundings. Such
evidence is being made use of practically every day in the
trial courts. The photographer takes his view from the

place indicated to him by his employer. He vouches for no more than the fidelity of the pictures taken from such standpoint, nor could the jury in this case have given it any greater effect. There is nothing to indicate that these views were not a fair representation of the place where, according to the state's theory, the deceased fell, and as such they were admissible in evidence. Of course, they were not conclusive of the true location, and, if appellant believed that views taken from or directed to the point where he locates the culmination of the affray would show a material variance from those presented by the state, it was an easy expedient to procure them and place them in evidence by the side of those relied upon by the prosecution. It is unfortunately true that photographic representation is sometimes misleading, but, on the other hand, it is frequently a valuable aid to the proper understanding and application of testimony of witnesses. We are unable in the record before us to find any reason for saying that there was error in exhibiting the photographs to the jury. The argument of counsel carried to its logical conclusion would exclude from the category of competent evidence all photographs, plans, plats, and diagrams which are not made by persons able to speak of their own knowledge concerning the facts which such representations are intended to illustrate. We are not willing to commit the court to such a radical innovation upon the long accepted rules of law governing the admissibility of testimony. *State v. Matheson,* 130 Iowa, 440; *State v. Rogers,* 129 Iowa, 229.

IV. The state put upon the stand one Tobias and one Funck to impeach the general reputation of the appellant for truth and veracity. It developed in the course of their testimony that both witnesses were residents of Muscatine, Iowa, some twenty miles distant from the place where appellant lived. This evidence it is said, should have been excluded because it appeared that the witnesses did

4. SAME: evidence of reputation: competency of witness.

not live in the appellant's neighborhood. This objection might well have been sustained by the court without error, but its admission was not necessarily erroneous. Both witnesses testified to their knowledge of the general reputation of appellant in his neighborhood, and not in their own. Their particular means or facilities of obtaining such knowledge were not developed by the direct or cross examination. If they were, in fact, acquainted with appellant's reputation in this respect in his own neighborhood, we think there is no sound reason for holding them incompetent to testify of it. The fact of their residence at a distance would go to the weight and value of their testimony, and not to its admissibility.

V. In answer to a question directed to him, a physician testifying for the state was permitted to say that the blow which produced the wound upon the head of the deceased was a "severe" one. This, counsel insist, was an invasion of the province of the jury. The objection is untenable. The witness was not asked nor did he undertake to state how the injury was inflicted nor what in fact caused it; hence the authorities cited in support of this assignment of error—*State v. Rainsbarger,* 74 Iowa, 204; and *Sachra v. Manilla,* 120 Iowa, 567—are not in point. The witness had shown that he had been called to the relief of the deceased immediately after the injury, and that an examination disclosed a very serious fracture of the skull, which was verified by the post mortem investigation. That the doctor should say that a blow producing such result must have been a "severe" one was to state a fact which would be apparent to every juror of intelligence, and his statement added nothing to the description which he had already detailed. Whether, as counsel argue, such result might have been produced by a comparatively light stroke with a heavy instrument or a powerful blow with a light instrument, is a wholly immaterial consideration. Whatever be the truth

5. SAME: expert evidence: conclusion.

in that respect, there is no room here for academic argument or speculation upon the varying circumstances under which such an injury might have been received. It is shown without dispute that appellant did strike the deceased upon the head with a stick of some kind producing the injury from which death ensued, and that the stroke was administered with sufficient force to shatter the victim's skull. Whatever the weight or character of the weapon and whatever the degree of muscular energy employed, the blow could not have been anything less than "severe," and, while it did not require an expert to discover that fact, his statement was clearly without prejudice.

The doctor was further asked: "What would you say as to the character of the weapon or club that was used to produce this fracture you found in the skull?" And over the objection of the appellant he an-

6. SAME.

swered: "I believe a blunt or rounded, fairly heavy object—possibly like a whiffletree. That is the most common shape." If the witness were to be interpreted as saying that the blow was administered with a whiffletree, the answer would probably have been incompetent; but such is not his statement. He speaks of a whiffletree merely as an illustrative example of the weapons with which such an injury could have been produced. Testimony of physicians and surgeons as to the nature of the weapon indicated by the appearance of a wound upon the human body is an everyday incident in the trial of persons charged with crimes of violence, and the rule under which it is admitted does not appear to have been violated in this instance. *State v. Rutledge,* 135 Iowa, 581; *State v. Morphy,* 33 Iowa, 270; *State v. Seymour,* 94 Iowa, 699.

It also appears from the physician's testimony that a wound was found on Driver's ear, and, upon being asked whether this injury could have been caused by the same blow which fractured the skull or by another distinct stroke, he replied that the wound was more probably the result

of a second blow. This is said to be incompetent and prejudicial, because no witness claims that more than one blow was struck and this testimony gave counsel for the state a pretext for arguing to the jury that appellant must have struck deceased while they were still in the barn.

Testimony is not necessarily incompetent because counsel deduce unwarranted conclusions therefrom. But aside from this obvious generalization, if two wounds were found upon the head of the deceased, we see no reason why the fact should not be shown in evidence, even though no witness saw more than a single blow delivered, or why the possible inference that a blow had been struck before the parties emerged from the barn was not a legitimate matter of argument. True, the wound on the ear may have been received in the fall of the deceased when knocked down by the appellant or from some cause for which he was in no manner responsible, but its discovery and treatment by the surgeon immediately after the affray was over makes it fairly a part of the res gestae to be given to the jury for what it was worth.

VI. One Windes, father-in-law of the deceased, testified that he saw the parties after they came out of the barn, and saw appellant pick up the stick and strike down the deceased, and, as the witness approached, Baker threatened him also if he interfered. In answer to an inquiry as to what he did next, the witness stated that he went for an officer. Counsel for appellant objected to the question, and moved to strike out the answer as incompetent and immaterial, but the evidence was permitted to stand. Error is assigned upon this ruling. While the materiality of this evidence is not very apparent, it is impossible to draw any reasonable inference of prejudice therefrom. Few, if any, cases are tried to a jury in which the testimony is wholly purged of all trivial, immaterial, and irrelevant matters, but, while courts, lawyers, and witnesses remain human, this is in-

7. SAME: immaterial evidence.

evitable, and, if no case is to stand except upon an absolutely perfect record, no judgment will ever be approved on appeal.

The proper inquiry is not merely whether a given circumstance is immaterial, but whether, if immaterial, it is reasonably calculated to mislead the jury or affect its verdict. We feel no such result could follow the giving of this evidence.

Other errors are assigned upon the admission of evidence to impeach the testimony of certain witnesses examined on the part of the defense, and of the conduct and manner of the state's counsel in the examination or cross-examination of witnesses. We can not undertake to consider these in detail. We have examined the record in each instance with care, and find no error calling for the interference of this court.

VII. Exceptions were preserved to the several paragraphs of the court's charge to the jury and to its refusal to give others requested. For example the defendant requested an instruction as follows: "In con-

8. SAME: murder: instructions: self-defense.

sidering the instructions given relating to the question of force which a man may use in self-defense, you are instructed that if men are engaged in a quarrel or controversy, the law does not require exactness or nicety in determining the amount of force which they may use in self-defense. You are to consider this under the instructions in view of the excitement or anger, if any, and under the circumstances surrounding the parties at the time." This the court refused, but on its own motion gave the following: "You are instructed that the danger which will justify a killing in self-defense need not be real, but only such as would lead a reasonably prudent man to believe in its reality; and in estimating the nature and imminence of the danger and the choice of means to avoid it, or the amount of force to be used in repelling it, the excitement and confusion of the surrounding circum-

stances, must be considered, and the party assailed is not
held to the same cool and deliberate judgment in estimat-
ing the danger or the choice of means of repelling it as .
is possible to persons unaffected by excitement or danger
in subsequently contemplating the situation. You are only
to judge him as a reasonably prudent, cautious, and
courageous man under the circumstances disclosed." This
charge appears to be fully as favorable to appellant as the
one refused, except in the mistaken inference to be drawn
from the request that a right of self-defense exists as be-
tween men engaged in mere "quarrel or controversy."

In this connection, also, the court in stating the law
as to the duty of a person to retreat from an assault if he
may reasonably do so with safety rather than to take life
in self-defense said that "the right of self-
9. SAME.    defense does not exist when the defendant
is in the wrong in bringing on the difficulty, unless he re-
treats before serious injury is done and the other party
then becomes the aggressor." Error is also assigned upon
this instruction. Were this language to be considered alone,
it could not be approved, as the jury could well infer there-
from that they were at liberty to go back to the beginning
of the quarrel and consider the right and wrong of appel-
lant's charge that Driver had stolen his lap robe, and this
we think could not properly be done. But when we read
all the court's instructions in this respect, it is clear that
such was not the intent or meaning of the statement. Im-
mediately before this paragraph, the court in speaking of
the law of self-defense had described it as the right of one
who is unlawfully attacked or assaulted by another to resist
and repel such assault by force. Immediately following
such paragraph, he proceeded to instruct the jury as to
what facts could properly be considered in determining
"who commenced the assault." Reading all that was said
on this subject, it is entirely clear that the court used the
sentence, "when the defendant is in the wrong in bringing

on the difficulty," as the equivalent of "when the defend-
ant is the aggressor," or "when the defendant first begins
the fight." The jury could give it no other force or effect
without disregarding the plain purport of the instructions
given them, and this we must assume they did not do.

VIII. The court refused the defendant's request to
instruct that: "If Driver had a knife in his hand and
was threatening to cut Baker at and about the time he was
struck by Baker, then Baker was not as a
matter of law bound to retreat. All the law
requires is that, under the circumstances as
they appear to him as a reasonable man, he would act as
a reasonable man under such circumstances." This re-
quest counsel contrasts with the following excerpt from the
court's charge, which is said to be erroneous: "To justi-
fy the taking of life, the person assailed must be in
danger of losing his life, or of suffering some great bodily
injury at the hands of his assailant, and it is, furthermore,
the duty of a person in such danger of death or great
bodily injury to retreat and withdraw from the encounter
if an avenue of escape is open, and he can withdraw with
safety to himself." The method of this criticism is not
quite fair to the trial court. It is true that the language
quoted is found in the charge, but it constitutes but one
isolated expression which does not of itself reflect the
substance of the instructions. This will be seen by refer-
ence to the quotation already made from the charge. More-
over, the jury were still further told: "You are instructed
that if you find that the deceased assaulted the defendant
with a knife, and the assault was so fierce and the danger
so immediate and threatening as not to allow him to retire
from the assault or delay in defending himself therefrom
without apparent danger, and he reasonably believed him-
self in imminent danger of death or great bodily harm,
he may kill his assailant, and the killing would be justifi-
able, and he could not be punished for the same." Cer-

tainly this gave to the appellant the sum and substance of the rule for which counsel contend, and the refusal to repeat it in the form requested was not erroneous.

A chief burden of the criticism of the charge in relation to the law of self-defense is that the court in several instances speaks of the "right to kill" in self-defense, and this it is said puts appellant in the unfavorable attitude of contending for the right to take life, when, in fact, he demands no more than the right to defend himself by the use of adequate force. It would seem to be a sufficient answer to this complaint to say that the alleged self-defense in the case under consideration did go to the extent of killing the alleged assailant, and the defense is of necessity based upon a right to kill under the circumstances by which appellant was surrounded, and the court could hardly speak of the defense in other terms. The right of self-defense includes the right to kill under certain circumstances, and it is upon that right the appellants plants his defense. It is a harsh phrase, but it has reference to harsh conditions and harsh acts, and no error can be well assigned upon the use of appropriate words by the court in speaking of them.

11. SAME: instructions: self-defense.

IX. Another assignment of error is stated as follows: The court erred in saying in the fifth instruction, "Whoever kills any human being with malice aforethought, either express or implied, is guilty of murder," and then defining malice as meaning, among other things, "anger," "hatred," and "revenge;" also in defining it to mean ill will. The definition of "murder" is given in the language of the statute (Code, section 4727), and surely no error can be predicated thereon. But the real point of the exception taken is aimed at the court's statement of the meaning of "malice," as used in said definition. From that statement counsel take the following excerpt: "By 'malice' is meant not only anger, hatred and revenge, but any other unlawful and unjustifiable motive."

12. SAME: instructions: malice.

And from this say that the jury were directed or left at liberty to find that, if appellant was angry when he struck the fatal blow, he is guilty of murder.  Here, again, counsel extract a single sentence from a general statement, and give to it a meaning and effect which it does not convey when read in its proper setting.  What the court did say is as follows:

Whoever kills any human being with malice afore-thought, either express or implied, is guilty of murder. Malice aforethought is a necessary ingredient in the crime of murder, either of the first or second degree, and must be established by the state before you would be justified in finding the defendant guilty of murder in either degree. By 'malice' is meant not only anger, hatred and revenge, but any other unlawful and unjustifiable motives.  It is not confined to ill will against the individual, but is intended to denote an action flowing from any wicked and corrupt intent.  An act done with a wicked mind and attended with such circumstances as to plainly indicate a heart regardless of moral and social duties, and fully bent on mischief, indicates malice within the meaning of the law.  The word 'aforethought' used in connection with the word 'malice' in our law simply means thought out or conceived beforehand, but it is not necessary that such malice should have existed for any considerable length of time to constitute malice aforethought within the meaning of the law.  It is sufficient if it exists for any length of time before the commission of the act.  'Malice aforethought' may be either express or implied.  'Express malice' means a settled purpose and design to commit the offense in question, and must be shown by proof of that fact directly and without inference.  It may be proved as generally understood by expressions of hatred, threats, and the like.  'Implied malice' means that which may be inferred from the act and fact shown.  Thus, when a wanton, wicked, cruel, or revengeful act is shown, the inference or implication may be drawn that the person who did such act was actuated by malice.

Not only is the jury not given direction or license to

charge defendant with malice because of mere anger or ill will which may or may not have any mixture of murderous purpose, but they are told that an act done in malice is for the purposes of the law one which is prompted by a "wicked and corrupt intent," an act done with a "wicked mind" under circumstances "plainly indicating a heart regardless of moral and social duties and fully bent on mischief." It is to be admitted that one may be angry or indignant, and yet have no malice in his heart, or he may even entertain a feeling of ill will without thought of doing bodily harm to him who is the object of his dislike, yet anger or ill will or both often do inspire and characterize malice which leads to murderous violence. It is such anger and ill will indicating wicked and corrupt intent, a condition of heart and mind having no regard for social or moral obligations, to which the court directs the attention of the jury, and in so doing there was no error.

X.   The court did not specifically define to the jury the meaning of the word "assault," and of this appellant complains.   The omission was in no way prejudicial to the defendant.   The court did in terms which

13. SAME:
instructions:
assault.

sufficiently include the elements of an assault charge the jury that, if attacked by the deceased, defendant could lawfully defend himself by force reasonably proportioned to the danger in which he was placed, and, if deceased in making such an attack was armed with a knife putting the defendant in reasonable apprehension of death, resistance thereto might lawfully be carried to the point of taking life.   Had appellant desired a more formal and technical definition of the term, the court would without doubt have given it upon request, but the essential elements of assault and the consideration to be given thereto were sufficiently embodied in the charge as given.   The technical definition of the word and its meaning as employed in popular speech are not so different as to require the court to resort to specific definition where

it may be used. *State v. Penney,* 113 Iowa, 697; *State v. Clark,* 78 Iowa, 492; *Henderson v. People,* 124 Ill. 607 (17 N. E. 68, 7 Am. St. Rep. 391); *State v. Harkins,* 100 Mo. 666 (13 S. W. 830). The court did, as we have seen, properly define the crime with which appellant was charged, and this was as far as it was necessary to go in the way of definition in the absence of any request for more.

Finally it is argued with much earnestness that the verdict is not sustained by the evidence. We shall not prolong this opinion for a general review of the facts. It is enough to say that in our judgment the testimony clearly warranted a conviction.

14. SAME:
self-defense:
evidence.

That appellant did kill Driver was shown without substantial dispute. There was also ample evidence which, if believed by the jury, justified the finding that the fatal blow was not struck in self-defense. Of what took place in the barn there is no living witness except the accused himself. The credit and the weight to be given his testimony was for the jury alone. Whether Driver was armed with a knife, and whether he threatened or attempted to strike the appellant with such weapon, was not so clearly proved that the court can say as a matter of law that the fact was established. In any event, whether Driver was or was not armed when he backed out of the barn in the direction of the street, it was open to the jury to find that, as a reasonable man, appellant ought to have stopped at the door and permitted his antagonist to go his way, instead of following him or continuing with him out into the public way and there striking him down.

If the barn was in some sense the appellant's "castle" from which he might lawfully expel the deceased, and deny him re-entrance, the expulsion once being accomplished, it was his duty to cease the display of force and permit the intruder to depart.

Of course, if Driver was in fact armed, and instead of retiring from the conflict was simply moving about seek-

ing an opening to rush in and wound or kill the appellant, the latter was not obliged to retire or turn away at the risk of a vicious assault, but the court can not say such was, in fact, the true situation. That question was fairly submitted to the jury which found that appellant was not in such real or apparent peril as to justify the extreme measure of self-defense to which he resorted.

Some members of the court would have been better satisfied with a conviction of manslaughter, but all are united in the conclusion that the finding against the theory of justifiable homicide is well sustained by the record.

Other questions have been presented by counsel. Most of them are governed by the conclusions hereinbefore announced and others are not sustained by the record.

The judgment of the district court will therefore be— *Affirmed.*

## SUPPLEMENTAL OPINION.

### SATURDAY, DECEMBER 14, 1912.

PER CURIAM.—On the consideration of appellant's petition for rehearing, the court is of the opinion that the sentence be reduced to fifteen years, and it is so ordered. Otherwise the petition for rehearing is overruled.—*Overruled.*