THE STATE OF IOWA, Appellee, v. FRANCISCO GIUDICE, Appellant.

CRIMINAL LAW: Change of Venue—Assignment for Trial in Other
1 County—Effect of Order. A valid order made by the district court of the county to which a criminal cause had been sent on change of venue, assigning said cause for trial on a certain date, is in no wise affected by the fact that the court of the other county, in ordering the change of venue, also entered an order that the cause be tried on the same date. Both courts having made the same order, the first order could have had no other effect than to notify the accused that he could expect a trial in the other county on said date.

JURY: Summoning During Term Time—Power of Judge. The judge
2 of the district court may, during term time, order additional jurors to be summoned. (Sec. 347, Code 1897.)

**JURY:  Temporary Discharge—Power to Compel Return.**  Jurors, so long as they have not been discharged, may be required to return and sit in any case.  It is wholly immaterial that the jurors may have been temporarily relieved from duty and paid for their services to date.

**JURY:  Competency—Reading Newspapers—Opinion—Bias.**  The formation of an opinion from reading newspaper accounts of an alleged crime and defendant's connection therewith does not, *ipso facto*, disqualify a juror when he (a) has no acquaintance with the defendant, (b) entertains no bias or prejudice, (c) has no personal knowledge of the facts and (d) is able to give and will give defendant a fair trial.

**JURY:  Competency—Race Prejudice.**  Race prejudice does not, *ipso facto*, disqualify a juror.  The suggestion is offered that it will be more in harmony with the idea of absolute impartiality to select juries with no unkind feelings toward the class to which defendant belongs.

**CRIMINAL LAW:  Evidence—Manner of Inflicting Wound.**  A physician who has personal knowledge of the nature of the wound inflicted on deceased, there being no eyewitnesses, may testify that such wound could, in his opinion, have been inflicted by a certain instrument *used in a certain manner*,—for instance, by a razor held in the hands of a person standing behind the deceased.

**JURY:  Objection to Separation During Trial—Duty of Court and Counsel.**  It is the duty of the court in a criminal cause to take the *full responsibility* for ordering the jury kept together, on request of either party.  It is equally the duty of counsel not to parade before the jury the fact that *he* is perfectly willing that the jury separate, thereby throwing upon the other party the odium of having requested the order.  Violation of this duty *held* nonreversible error because the objection to the separation of the jury was withdrawn.

**HOMICIDE:  Identity of Accused and Assailant—Range of Cross-Examination.**  Questions tending to rebut, impeach, modify, explain or in some way qualify the statements made on direct examination constitute legitimate cross-examination.

PRINCIPLE APPLIED:  The deceased rushed into a roundhouse with his throat cut and, pointing to his wounds, said, ''Dago! Dago!'' and almost immediately expired.  Trouble had occurred between the deceased and the accused.  A witness testi-

fied that the accused went by the name of ''Dago.'' *Held,* accused had the right to inquire as to the number of other men in the same yards who went by the name ''Dago.''

**WITNESSES:** Examination—Objections by Different Associated Counsel—Statute. It is not improper for more than one counsel to enter objections to proceedings. Sec. 3700, Code 1897, requiring that but one counsel on each side shall examine the same witness, has no application to the making of objections.

**APPEAL AND ERROR:** Showing of Prejudice—Necessity. The court must have something more than a mere guess on which to hang a holding of prejudice.

PRINCIPLE APPLIED: Accused was on trial for homicide. The state, over objection, proved that when Exhibit ''A'' was signed, no promises were made. But what Exhibit ''A'' was did not appear. Again: Over objection, some history concerning ''a paper'' was detailed. But, again, the nature of ''the paper'' and its relation to the case did not appear. Again: The sheriff, over objection, testified that he removed the defendant from Council Bluffs to Atlantic and thence to Logan, the latter change being made because the newspaper reporters had discovered the whereabouts of the accused. *Held,* in each case, nothing appeared on which to hang the conclusion of prejudice.

**CRIMINAL LAW:** Crime Committed—Subsequent Demeanor of Accused—Admissibility. Defendant's actions and demeanor immediately after the commission of an offense are a legitimate subject of inquiry; for instance, that, on being informed of the death of the deceased, he hurriedly dressed and left his stopping place.

**CRIMINAL LAW:** Questionable Conduct—Severe Characterization by Opposing Counsel—Effect. The law is partial to the truth. If counsel's conduct during the progress of the trial is very largely a matter of ''hot air,'' it is not reversible error for the opposing counsel to so characterize it.

**HOMICIDE:** Exhibits Connected with Offense Charged—Proper Identification. Evidence reviewed and held to show such connection as to justify the admission of a razor and bloody pillow slip.

**CRIMINAL LAW:** Evidence—Res Gestae Doctrine Applied. *Res gestae,* a frequent test, ''were the facts talking through the party, or the party talking about the facts?''

PRINCIPLE APPLIED: Deceased stated to two different witnesses that he was "going down Avenue I." This would take him past a woodpile where it was claimed the accused assaulted deceased and cut his throat. Immediately after making the statement, he left the room, and immediately thereafter rushed back into the office with his throat cut. *Held*, admissible as part of the *res gestae.*

**CRIMINAL LAW: Trial—Prejudicial Argument.** The object of a change of venue is to avoid prejudice and thus assure to the accused an absolutely fair and impartial trial, and the county attorney who, in the trial of the cause, attempts to restore prejudice against the accused by parading before the jury the fact that the accused has taken a change of venue, falls far short of the high ideals and spirit of fairness which ought to characterize a public prosecutor. It is misconduct, though not necessarily prejudicial.

**CRIMINAL LAW: Trial—Argument Aside Record—Prejudice.** Counsel for the state must keep within the record. The prompt granting of a new trial is the penalty, under the record, for bitterly assailing the accused, during argument, for offenses and lecherous and scandalous conduct of which the record was barren of evidence.

**CRIMINAL LAW: Trial—Improper Argument—Waiver—General Exception.** Objection to an improper argument should, it is true, be made when the argument is made, or a waiver of the objection will result, but this rule is sufficiently complied with when, in order to avoid interruptions, it was agreed that the accused should have an exception to all parts of the opposing argument.

*Appeal from Mills District Court.*—HON. THOMAS ARTHUR, Judge.

WEDNESDAY, JUNE 23, 1915.

THE defendant was convicted of murder in the first decree, and appeals.—*Reversed and Remanded.*

*George Cosson,* Attorney General, and *John Fletcher,* Assistant Attorney General, for appellee.

*John J. Hess,* for appellant.

LADD, J.—Howard Jones was employed in firing a switch engine at the yards of the Chicago & Northwestern Railway Company in Council Bluffs, and on the evening of May 27, 1913, shortly after 11 o'clock P. M., rushed into the foreman's office in the roundhouse with his throat cut. He was excited and tried to talk, pointed at his throat and said, "Dago, Dago," seized a pen and tried to write, but fell on the floor and died before the physician reached him. The defendant, who is an Italian, had been employed by the railroad company, and on May 13th previous, Jones had directed him to put a headlight reflector on an engine. Defendant refused to do so and was told by Jones that unless he did, he would "turn him in to McCaw," the general foreman. Subsequently Jones did so, and the defendant was suspended from employment. The theory of the prosecution was that defendant killed Jones in revenge. The errors assigned will be taken up in the order argued.

I. The indictment was returned June 6, 1913, and five days later, the defendant was arraigned and entered a plea of "not guilty." A motion for change of venue from Pottawattamie county was filed on the 13th of the same month, and on the 16th of June, the court ordered that the cause be transferred to the district court of Mills county and "specially assigned for trial before said court on Monday, June 23, 1913, and that if the regular spring term has been finally adjourned that a special term be and is hereby called to begin on said day for such trial, and that if the regular term is still open, then court reconvene on said day for such trial, and that the jury be summoned forthwith to appear on said trial on said day, any judge of the district court making any order with reference thereto which he may deem proper." On the same day his honor, Judge E. B. Woodruff, one of the judges of the district, addressed an order to the clerk of the district court of Mills county, directing that "the record show that such district court is adjourned

1. CRIMINAL LAW: change of venue: assignment for trial in other county: effect of order.

until June 23d at 9 o'clock A. M. for the purpose of the trial of the case of the *State of Iowa v. Frank Giudice, alias Henry Wiley*, and for the transaction of any other business that may

2. JURY: summoning during term time: power of judge. come before the court.'' And another order was entered, directing that 30 additional jurors, as provided by law, be drawn for the trial of said cause and summoned to appear at 9:30 o'clock, June 23, 1913, and also that the original panel for the April

3. JURY: temporary discharge: power to compel return. term, 1913, not heretofore excused by the court, be summoned to appear at the same time. The record showed that the jurors in attendance at the said term drew their compensation on April 30th and had not appeared thereafter until the morning of June 23d.

Appellant contends that the district court of Pottawattamie county, after having entered the order transferring the cause to Mills county, lost jurisdiction of the same, and that the portion of the order assigning the cause for trial on June 23d was without jurisdiction and deprived the defendant of a reasonable time within which to prepare for trial. While the district court of one county may not bind the court of another by entering an order with reference to the transaction of business in the other county, yet the portion of the order objected to had the effect of carrying to defendant notice of the time the cause would likely be called for trial, and this being true, the order of the court of Mills county, upon convening, June 23, 1913, that the trial proceed at once, was without prejudice in not affording the defendant at least the intervening time to prepare for trial, and there is no showing whatever that this did not afford the defendant ample time in which to prepare for his defense. The order directing the drawing of 30 additional jurymen was not without jurisdiction even if made in vacation; for Sec. 347 of the Code expressly authorizes the judge, either before or during the term, to order as many additional jurors drawn for the trial of any particular case as may be deemed necessary. See

*State v. John,* 124 Iowa 230. Though the jurors of the original panel had drawn their compensation April 30th, for services already rendered, they had not been finally discharged, and we know of no reason why the jury, when temporarily excused, may not be required to return and sit in any case properly before the court and not disposed of. *State v. Phillips,* 119 Iowa 652. Such is the practice with grand jurors. *State v. Disbrow,* 130 Iowa 19. As the jurors had not been discharged for the term, they were competent to sit in the trial of any cause which it might be found necessary subsequently to try, and there was no error in re-summoning them for the determination of the case at bar.

II. The defendant exercised all his peremptory challenges, and now complains of the ruling of the court on challenges for cause as to several of the jurors. These jurors

4. JURY: competency: reading newspapers: opinion: bias.

had read newspaper accounts concerning the killing of Jones and the connection, if any, of defendant therewith, and thereon had formed an opinion. None were acquainted with defendant, nor entertained bias or prejudice against him, nor had personal knowledge concerning the facts, and asserted that they were able to accord him a fair and impartial trial. Without reviewing the cases, it is enough to say that there was no abuse of discretion in overruling all the challenges for cause save that about to be considered. *State v. Young,* 104 Iowa 730; *State v. Hassan,* 149 Iowa 518.

III. The answers of H. B. Nutting for cause disclosed

5. JURY: competency: race prejudice.

that he entertained a prejudice against the nationality of the defendant. He swore that prejudice against Italians was strongly fixed in his mind and had been entertained for some time.

Q. "And if selected as a juror you would have a prejudice against this man because of the fact that he is a member of the nationality to which he belongs?" A. "Well, only just as a nationality, yes, sir. . . ." Q. "And it would

be in your mind always in the consideration of this case, would it not, the prejudice you entertain?" A. "Well, I would not let that hinder." Q. "Isn't it a fact that the prejudice that you have would be with you during all this time?" A. "Yes, sir, I think so." Q. "And it would be in your mind during your consideration of the entire case?" A. "It would."

On further examination, he stated that he would not carry the prejudice in the jury box with him, would disregard and lay it aside, and that he had "no particular prejudice against defendant, and if selected as a juror would try the case fairly and impartially." After saying that he would continue to entertain the prejudice against the nationality, he was asked by the court:

"Do you think an Italian is entitled to a fair trial by this court?" A. "Certainly I do." Q. "Can you give one a fair trial?" A. "Yes, sir."

He stated farther that he had talked about the case and spoken about the prejudice mentioned.

Q. "Are you certain that you can entirely blot that (prejudice) out of your mind?" A. "Well, I don't think I could entirely blot it out of my mind." Q. "And you are absolutely certain that you could blot it out and remove from your mind the prejudice you say you entertain?" A. "Well, I would not promise that; no, sir." Q. "You would not be willing to state that you would entirely remove from your mind the prejudice that you entertain against this man because of his nationality?" A. "No, sir."

The challenge for cause was overruled. It will be observed that the juror did not indicate the nature of his prejudice, that he entertained none against the accused personally, and that he insisted that he could accord him a fair and impartial trial. In these circumstances, the rule is quite

well settled by the authorities that race prejudice will not disqualify the person called as a juror. In *State v. Casey*, 44 La. Ann. 969, the court said that "Race prejudice exists everywhere among all nations, who favor their own race and believe it is the favored and cherished race of the world. No man, because he thinks his own race superior to another, is disqualified as a juror on this account." In *Bass v. State*, 127 S. W. 1020, some of the jurors stated that they had a prejudice against the negro race socially, but not civilly or legally. This was said to have meant "that they would not recognize negroes as companions or associates but had no prejudice against the race which would influence or affect their action in respect to any right or rights under the law." In *State v. Green*, 129 S. W. 700, objection to the juror was that he refused to drink with a negro, and it was said that the mere fact that the juror refused to put himself on a social level with the negro did not disqualify him to sit in the trial of the cause and render a fair and impartial verdict. In *Johnson v. State*, 130 N. W. (Nebr.) 283, the juror, on *voir dire*, stated that he had a feeling of prejudice against the colored race, but had no prejudice against the defendant; and the court held that the so-called prejudice against the race was simply a feeling or belief that it was inferior to the white race, and that this fact would not affect his verdict; saying that, "Without doubt many white men have the same feeling as did juror Manguld, but this alone has never been considered sufficient to disqualify them from acting as jurors on cases where colored men have been tried for criminal offenses." In *State v. Brown*, 87 S. W. 519, the juror stated that he had some prejudice against the negro race, but that he had no bias or prejudice that would prevent him from impartially trying the case under the law and evidence. It was then said that "the statement of this juror as to his attitude toward the colored race must be treated as nothing more than a notification to appellant that while he had no prejudice against him and could impartially try his case, yet, in making

his peremptory challenges, the fact of the juror not being favorably impressed with the negro race might be taken into consideration," adding that while "technically the juror was not disqualified, it would be more in harmony with absolute impartiality to select a panel of jurors who have no unkindly feeling toward the class to which the defendant belonged." *Pinder v. State,* 27 Fla. 370, 26 Am. St. 75, often quoted as holding that race prejudice disqualifies a juror from sitting on the trial of a person belonging to such race, does not so hold. The refusal to permit the following question to be put to jurors was held error: "Could you give the defendant, who is a negro, as fair and impartial a trial as you could a white man, and give him the same advantage and protection as you would a white man upon the same evidence?" Manifestly, a juror who could not give such a trial ought not to sit. In *State v. McAfee,* 64 N. C. 339, the defendant was a colored man, and the court refused to permit the following question to be propounded to a juror, i. e., whether he believed he could, as a juror, do equal and impartial justice between the state and a colored man; and for obvious reasons, the judgment of the trial court was reversed. In *Balbo v. The People,* 80 N. Y. 484, a juror in answer to a question said that it (Italian) "was a race that he was not particularly fond of, and did not think much of, judging from those we have here." And the court held that "the fact that the juror may have had some prejudice against the Italian race was not, we think, a disqualifying circumstance." See *Moore v. State,* 107 S. W. 540; 17 Am. & Eng. Ency. of Law, 1131. The text is to the effect that "one should not be excluded from jury service merely because he does not like or think highly of the race to which the defendant belongs."

The answers of the juror indicate no more than that on some grounds he did not like the Italian race, but the ground for this was not disclosed, and for all that appears, it may have been owing to a matter which did not affect in any way his obligation to accord defendant a fair and impartial trial.

In *State v. Buford,* 158 Iowa 173, the proposition was before this court, and it was held that, as the juror had no feeling or prejudice against the defendant owing to his race, no acquaintance with him and had no personal bias against him and said that he could give him as fair and impartial a trial as he could a white man, the court rightly held the juror qualified. Though of the opinion that technically no abuse of discretion in overruling the challenge for cause can be said to appear, we agree with the suggestion in *State v. Brown, supra,* that it would have been more in harmony with the idea of absolute impartiality to have selected a jury with no unkindly feeling toward the class to which defendant belonged. This is suggested in view of another trial, which must be accorded because of errors in other rulings.

IV. The physician who was called and reached the deceased immediately after his death testified that he found a wound on the left side of the throat an inch and a half deep, coming out on the right side not quite so deep, that the exterior carotid artery was cut and the interior carotid artery was partially cut, and that the windpipe was cut, and that he died from such wounds. After saying that the cut had been inflicted by an instrument with a sharp edge, he was asked: "Could a razor inflict that kind of a wound?" Over objection as being leading, suggestive, immaterial and irrelevant, he answered, "It could have been done so." He was then asked: "From the nature of the wound could that have been inflicted by a man coming up from behind and cutting him from behind?" Over objection to the question as calling for a conclusion and as speculative, and that the witness was incompetent, he answered, "It could have been done that way." There was no eyewitness to the occurrence, and, as the inquiry was as to whether the wound might have been caused by a razor, or by a razor in the hands of a person reaching from behind, we think the rulings correct. *State v. Baker,* 157 Iowa 126; *State v. Rutledge,* 135 Iowa 581; *State v. Seymour,* 94 Iowa

6. CRIMINAL LAW : evidence : manner of inflicting wound.

699; *State v. Porter,* 34 Iowa 131; *State v. Morphy,* 33 Iowa 270.

7. JURY: objection to separation during trial: duty of court and counsel.

V. After the trial had begun and several witnesses examined, the court, in the presence of the jury, remarked: "There has been a request that the jury be kept together during the trial of this case." -

Mr. Ware (counsel for the state): "It didn't come from the state."

Court: "That is a request that must be granted when made under the statute. It is not a matter of discretion with the court."

The court then ordered the jury to be kept together. Thereupon a juror said:

"Your Honor, it will cause me severe trouble in my business, to be locked up, for the present moment; I ask that whoever made that motion withdraw it."

Court: "What was it that you want to attend to?"

Juror: "I want to see to the running of the farm."

Capell (County Attorney): "The state will consent to that, we do not ask to put them out."

Court: "The request to keep the jury together has been withdrawn and the order will be vacated and cancelled."

The statute permits the separation of the jury at any time before the final submission of the cause to them "except where one of the parties objects thereto." Sec. 5382, Code. Upon the request of either party, the jury must be kept together, and it is error not to do so. *State v. Garrity,* 98 Iowa 101; *State v. Smith,* 102 Iowa 656. This objection must be made to the court. *State v. Smith,* 107 Iowa 480. But it is the preferable practice that this be not done in presence of the jury, and that counsel avoid any allusion thereto in the presence of the jury. The presiding judge, in

making the order, should assume the responsibility of so doing; for if this be cast on either party, the jury may feel resentful, and, even though the order be essential to a fair trial, the announcement by counsel that it was not at the instance of the state ought not to have been made, and the statement of the court to the jury that such a request had been made and must be granted is disapproved. But as the order was withdrawn, and the jury never confined thereunder, we are of the opinion that any possibility of prejudice was obviated. Such was the holding in *State v. Walton,* 92 Iowa 455.

VI. The roundhouse foreman testified that some of the employees about there called the defendant "Dago," and that when the deceased entered his office, he pointed his hand to

**8. HOMICIDE: identity of accused and assailant: range of cross-examination.**

his throat, saying, "Dago! Dago!" On cross-examination, witness was told to "Name some of the other men that were called Dagos. A. "Any of the Italians." Q. "Any of them?" An objection as not cross-examination was sustained, the court saying that it had been fully answered. Witness was then asked: "Who were all the Italians around there?" A like objection was sustained. Q. "Was there any other man in the yards there that they ordinarily or off and on referred to as a 'Dago,' or called 'Dago'?" A like objection was overruled and the witness answered, "Any of them." Q. "Was there any other man that went by that name?" An objection as previously answered was sustained. Q. "Do you know one man about those yards that the name was ordinarily applied to?" Objection as already answered was sustained. Q. "How many men who were called Dagos were employed around there?" Objection.

The manifest design of the state in showing that defendant was referred to by those working about the roundhouse was to connect defendant with the exclamation of deceased. As bearing thereon, the inquiry as to whether defendant was the only one about there referred to as "Dago" was perti-

nent, as was also how many others and who were so alluded to, and we are of the opinion that the questions were not vulnerable to objection as not proper cross-examination. It may be that the name was applied to any Italians, but this did not indicate that there were any such working about the roundhouse. If there had been any such, the appellation "Dago," as repeated by deceased, may as well have had reference to one of them as to defendant. The court erred in excluding the evidence.

VII. The state was represented by four attorneys, and at times, questions propounded to a single witness were objected to by two or three of the attorneys for the state; that is, separate objections were interposed by each, and this is complained of as constituting misconduct. If done in an ordinary manner, we see no objection to more than one attorney on a side interposing objections. All that the statute exacts is that "but one counsel on each side shall examine the same witness." The design of this statute is to obviate repetition and waste of time, which is likely if more than one participate in the examination of a witness. Here the witness was being examined by the attorney for the defense and the statute had no application; for the interposition of objections, though connected therewith, is no part of the examination.

9. WITNESSES: examination: objections by different associated counsel: statute.

VIII. A deputy sheriff of Harrison county, after stating that he was at the jail when Exhibit "A" was signed and heard the talk between the county attorney and defendant prior to the making thereof, was asked, "What, if any, promises were made by anyone present, by yourself, Mr. Rock, by Mr. Stuart or Mr. Capell?" Over objection as incompetent, immaterial and irrelevant and calling for a conclusion of the witness, the witness answered, "There were no promises made." Counsel for the defendant contends that this called for a conclusion as to what was said and that the witness should have been permitted to give the

10. APPEAL AND ERROR: showing of prejudice: necessity.

conversation. What Exhibit "A" was, by whom signed or to whom no promises were made does not appear from the record, and even though the position of counsel be correct, there is no indication whatever that any prejudice resulted. The witness Stuart was permitted to state over objection that "A request was made for a paper and that it be delivered to Mr. Myers, deputy sheriff." Q. "What did he say he wanted it for?" This was objected to as incompetent, immaterial and irrelevant, and the objection overruled. A. "He said Mr. Wiley wanted to read over the statement." The defendant moved to strike the answer out, and Myers, the witness, was then permitted, over objection, to state that Wiley took it and went out of the dining room into the kitchen and jail. What the paper was or what Wiley did with it is not disclosed in the record, and its relation to the case is not disclosed. It is needless to say that, under these circumstances, we are unable to say that the ruling was erroneous, and even if it were, it does not appear to have been prejudicial.

The sheriff of Pottawattamie county was allowed to state, over objection, that he moved the defendant from Council Bluffs to Atlantic, and thereafter to Logan; that he made the latter change because of the newspaper reporters having located him. It is said that the purpose of the state in introducing this testimony was to get before the jury the fact that it was necessary for the sheriff to conceal defendant in order to protect him, and that unusual precautions were taken, owing to conditions, for the protection of defendant's life, and that it tended to inflame the minds of the jury and prejudice them against him. All shown was merely where he had been since the commission of the offense, and it seems to us that it is quite a strain on the imagination to attribute the change of location to the design mentioned. As the evidence had no bearing on the guilt or innocence of the defendant, it might well have been omitted.

One Porche testified that the evening before Jones lost his life, the defendant stated to him that he was "going to

kill him''; that he saw a razor in his pocket; that shortly after Jones' throat was cut, at about 12:10 o'clock A. M., he informed him that Jones had died and had written defendant's name, and that defendant said, "I will go to Dominic Sesto's.'' He was then asked: Q. "Did he dress in a hurry?'' This was objected to as leading and suggestive, and he answered, "Yes.'' There was no abuse of discretion in permitting the question, and it was competent as showing the conduct of the defendant immediately after the commission of the offense charged.

11. CRIMINAL LAW: crime committed: subsequent demeanor of accused: admissibility.

IX. On cross-examination by counsel for defense, the record is as follows:

Q. "You shot a man over at Folsom, didn't you?''

Mr. Capell: "Objected to as incompetent, immaterial and irrelevant.''

Court: "Sustained.''

Q. "Did you shoot a man over at Folsom by the name of Ralph Mesena?''

12. CRIMINAL LAW: questionable conduct: severe characterization by opposing counsel: effect.

Mr. Genung: "Objected to as incompetent, immaterial and irrelevant and not proper examination.''

Court: "Sustained.''

Q. "Did you ever shoot any more than one man while you were at Folsom?''

Mr. Capell: "Objected to—''

Mr. Clyde Genung: "That is shooting hot air into here.''

Court: "Objection sustained.''

Mr. Hess: "I object to the statement of the various counsel on the other side of the table and object to it as misconduct.''

Mr. Clyde Genung: "I think the court ought to take the attorney for defendant to task for insisting on sticking in that prejudicial stuff that he knows is not true.''

Mr. Hess: "Let the record show that we except to the remarks of counsel for the great state of Iowa as prejudicial.''

Mr. Ware: "You ought to make a general objection to everything we do and save this annoyance."

Mr. Hess: "I object to the remark of the assistant prosecuting attorney as misconduct and incompetent."

Q. "Isn't it a fact that you had trouble with Frank Mensena at Folsom and in connection with that trouble you shot him with a rifle?" (Objected to as incompetent, immaterial, irrelevant and not proper cross-examination.)

The Court: "Sustained."

Mr. Genung: "I think counsel for the defendant ought to be instructed to go on, where he has made his record."

The Court: "I guess there isn't anything pending."

Mr. Genung: "Let the record show that the state at this time asks the court to direct the defendant's counsel to desist from this line of cross-examination, having already made his record and ruling been had thereon, that the evidence is incompetent."

Mr. Hess: "The remarks of counsel are excepted to by defendant as misconduct and the counsel for the defense now asks the court to direct the various counsel on behalf of the state to desist from that kind of remarks.

The Court: "Well, the court does not see any occasion for making this special ruling except that there is nothing pending in the way of a question and we ought to proceed."

Counsel for the defendant except especially to the remarks of the attorneys for the state concerning "shooting hot air into the case," and "insisting on sticking in that prejudicial stuff that he knows is not true," and also the remark regarding the general objection. It will be noticed that, though the characterization of the efforts of the counsel for the defense was somewhat original, it described quite accurately what was being undertaken. He was propounding a line of questions which he must have known were improper and seeking to inject evidence in the case that had no place

there, and if the counsel for the state resorted to a severe characterization of what was being undertaken, it cannot be said to have been unjustifiable, in view of the circumstances, that the court, instead of forbidding that line of examination, simply ruled on the objections. It was an attempt to bring before the jury matters that had no place there, and, by a repetition of the questions in different forms, to impress the minds of the jury with the supposition that the witness had committed a crime, although this could not have been proven. There is no ground whatever for charging that counsel for the state went farther than they should in obviating this result. There was no misconduct on their part.

X. The defendant had been rooming at the house of Josephine Forragi, and she, after saying that she saw the razor in the hands of Tony Roberts on the morning following the killing, was asked, "Did you see what Tony Roberts did with this razor?" Objection was overruled, and she answered: "I seen it as he walked out. Examined the pillow slip on the morning of the 28th, there was stain of blood. Exhibit 10 is pillow slip." Porche had testified that he had gone to defendant's room shortly after the occurrence and had seen the razor between the mattress and the pillow, and that in the morning, he saw the razor in the hands of the landlady, who was making the bed. This so far connects her testimony as to render it admissible.

**13. HOMICIDE: exhibits connected with offense charged: proper identification.**

One McGruder, a night clerk at the roundhouse, saw deceased at about 11 o'clock as he came from the roundhouse office, and heard an engineer ask him if he was going home. To this he responded: "No, I want to go out Avenue I." An objection "as incompetent, immaterial and irrelevant" was overruled. The next question was, "What did he say?" A. "He said he wanted to try to get a full month this month." The latter answer had no relation to the case, but it is said that the statement where deceased wanted to go had

**14. CRIMINAL LAW: evidence: res gestae doctrine applied.**

a material bearing, as that he went past a certain woodpile where the crime is alleged to have been committed. This was immediately before he returned to the same office with his throat cut, and we think so closely connected with the transaction as to constitute a part of the *res gestae*. One Skaith testified that he had a talk with deceased at the round-house, and, in response to a question, the latter said he was going home right away, "right down Avenue I," and that he left immediately and would pass to the south end of the woodpile. This evidence was admissible on the same ground.

Defendant undertook to have identified Exhibit 16 by the witness Stuart, but was not permitted by the court to do so. As we have no means of knowing what Exhibit 16 was, it is impossible to say whether there was error.

XI. The county attorney in his opening argument said, "I believe that Pottawattamie county owes to the citizens of Mills county, and to you jurors especially, an apology and

15. CRIMINAL LAW: trial: prejudicial argument.

an explanation of why we are here today; but I want to assure you, gentlemen, that it is through no solicitation on the part of the prosecuting attorney that we are here today." This was objected to as misconduct, and it was such. The evident purpose was to make capital out of the fact that defendant had procured a change of venue to Mills county. It was of no concern to the jury how the cause came to be there and no apology was due from anyone for its being there for trial. It was enough that the court had ordered it to be tried in Mills county. Possibly no prejudice is to be inferred, but it is preferable to avoid "peanut" practice in the trial of causes, especially wherein guilt or innocence of grave charges is to be determined.

In the course of the closing argument, L. T. Genung, assisting in the prosecution, said:

"Mr. Hess says he will make no allusion to this woman, Mrs. Coffman. You have no right to make any allusion with

reference to Mrs. Coffman. When your client will lay his hand on another man's wife, with her little child by her side, to seduce her away from her husband in the dead of night, for only a purpose that he knew in his heart, then you come in and criticise! Ruin a man's home, defile his wife, and then come in and criticise her! I pity the woman who falls from grace with a child by her side, led on by a villain who has no respect for the family circle and home, to take her out and destroy her. You (indicating the defendant) not only ruined the Coffman home, but another home. . . . Now, does it appear to you why he wouldn't take a day job? Why, isn't it reasonable to assume from the testimony that if he was out with this Mrs. Coffman, and if he lived there within three doors of Mrs. Coffman and had such control over her that he could order her to meet him at the theater that night; that he could direct her to take her child to her home—out where no human eye could see; and he compelled to work days, what does that mean? Why, it means that this defendant's time, it is put in at work at the same time Mrs. Coffman's husband, who was a teamster driving a team in the daytime was engaged, and their nights would be spent at home. But reverse it. Let him work nights and Mr. Coffman days—think of the opportunity to him for his hellish purpose.''

16. CRIMINAL LAW: trial: argument aside record: prejudice.

The only foundation for this to be found in the record is the testimony of Frances L. Coffman, to the effect that she knew defendant, had seen him frequently, ''saw him the day Howard Jones was killed, at my home in the morning and along toward evening. Saw him at the Majestic theater that evening. He was with Antonio Roberts. A friend of mine, Mrs. Lane, was with me. We left the theater at about 9:30. We walked around a while until about 10 o'clock, or a little after. Had talk with defendant about Howard Jones. Said he thought he ought to get even with Jones for making him lose his job. I told him not to do anything to Jones.''

This gave no warrant for what was said. He was bitterly assailed for offenses concerning which there was no proof and could properly have been none, and there is no escape from the conclusion that what was said was extremely prejudicial. But the attorney general suggests that no exceptions were taken at the time. True, but it was agreed that, to avoid interruption, defendant might have an exception to everything that was said, and the misconduct was one of the grounds on which the motion for new trial was based. In this state of the record, the state is in no position to insist that objection should have been made. The misconduct was so manifestly prejudicial that the citation of authorities is unnecessary. Because of the errors pointed out, the judgment is reversed and the cause remanded.

17. CRIMINAL LAW: trial: improper argument: waiver: general exception.

DEEMER, C. J., GAYNOR and SALINGER, JJ., concur.