# THE STATE v. TOM BROWN, Appellant.

### Division Two, May 16, 1905.

1. **JUROR: Prejudice Against Negro Race.** A juror, on his *voir dire* examination, said he had some prejudice against the negro race, to which defendant belonged, but that he had no prejudice against him, and that he could fairly and impartially try the case without any bias or prejudice against him. *Held*, that he was qualified to serve as a juror in the trial of defendant for murdering a white man; but it would be more in harmony with absolute impartiality to select a panel of jurors which have no unkindly feeling towards the class to which defendant belongs.

2. **DYING DECLARATIONS: Admissibility.** The physician who attended deceased immediately after the fatal shot positively stated it was necessarily fatal, and deceased died about twelve hour later, shortly before his death making a dying declaration, which was reduced to writing as he dictated it and signed by him, in which he said that he was nigh unto death and fully aware that death was certainly approaching. *Held*, that it satisfactorily appears that this declaration was made under a sense of impending death, and it was, therefore, admissible in evidence.

3. ————: **Conclusion: Statement of Fact.** The dying declaration contained this clause: "As he arose from the table he was reaching in his pocket for his revolver." *Held*, that this was not a mere statement of a conclusion, but a statement of fact, and that it was such is demonstrated by the fact that defendant did get his revolver and shoot deceased.

4. **MURDER: Evidence of Irrelevant Matter: Prejudicial Error.** Two or three hours prior to the shooting of deceased, defendant, a negro, whose name is Tom Brown, was about to get into a hack, and just then one of the horses whose name was Tom, moved, and the hack driver said, "Whoa, Tom, you black s—— o—— b——, I will break this crutch over you." Thereupon, defendant presented his revolver at the hack driver, and asked, "Was you speaking to me?" to which the driver replied that he was not. *Held*, that this being evidence of a separate and distinct assault, was incompetent and irrelevant testimony in the murder trial, and should have been excluded. *Held*, also, that, guided by the rule that whenever error is committed in the trial of a criminal cause presumptively it is prejudicial and will be so treated by the appellate court unless it is made manifest by the disclosures of the entire record that such error could not

State v. Brown.

have resulted in any harm to the defendant, the judgment in the murder case, in which the jury were required to find the existence of malice, premeditation and deliberation, will be reversed, and the cause remanded for the erroneous admission of this irrelevant testimony.

5. ———: ———: ———: **Doubt.** Doubt or uncertainty as to the prejudicial effect of irrelevant testimony should be resolved in favor of the defendant.

6. ———: **Statements to Third Parties.** Statements made by defendant to third parties prior to the homicide indicative of the existence of the frame of mind or disposition from which criminal actions flow, are competent evidence.

7. ———: **Instruction: Deliberation: Premeditation.** In the conclusion of an instruction for the State in a murder trial the jury were told that "if they can satisfactorily and reasonably infer the existence of deliberation and premeditation, then you will be warranted in finding the defendant guilty of murder in the first degree." *Held*, correct.

8. ———: ———: **Abstract Law: Application.** Where an instruction, correct as an abstract proposition of law, is followed by another which applies the law to the facts of the case, there is no error in giving the first. The two instructions are to be read together. But it would be better practice to fully present the law and its application in one instruction.

Appeal from Greene Criminal Court.—*Hon. J. J. Gideon*, Judge.

REVERSED AND REMANDED.

*M. C. Smith, J. T. Blair* and *C. J. Wright* for appellant.

(1) Defendant was entitled to a jury whose verdict would not take into consideration the color of his skin. (2) The testimony of witness Reese was all incompetent. That part of it wherein the witness speaks of the pistol or gun and seeing it was properly objected to and exception taken to its admission; so with the remarks attributed by the witness to defendant. (3) The evidence fails to show that the alleged declaration was read to the declarant before he signed it. No

foundation was laid for a dying declaration. "Before a dying declaration should be admitted, a foundation for such evidence should be laid, showing the expressions or action of the deceased, his sense of impending death, and the circumstances surrounding him at the time, in order that the court may judge whether the deceased, at the time he made the declarations, was conscious of his condition." It is not sufficient that the dying declarations offered should state these facts. Kerr, Law of Homicide (Ed. 1891), sec. 412; 1 Archbold's Crim. Prac. and Plead. (7 Ed.), pp. 449, 451; 1 Greenl., Evi. (12 Ed.), sec. 158.

*Herbert S. Hadley,* Attorney-General, and *Rush C. Lake,* Assistant Attorney-General, for the State.

(1) The court was not in error in denying the challenge for cause in the examination of the jurors on their *voir dire.* R. S. 1899, sec. 2616; State v. Brennan; 164 Mo. 507; State v. Elkins, 101 Mo. 349. (2) It was competent for the court to admit the testimony of witnesses Reese and Walker as to the declarations and conduct of defendant on the night of the occurrence. It is evident from the testimony that defendant was prepared for any emergency which might arise where "a gun" could be used. State v. Grant, 79 Mo. 137; State v. Hamilton, 170 Mo. 377. (3) There can be no question that the declarant was in *extremis.* His statement shows it and the fact of his death, on the day following the one upon which he was shot, confirms his belief. The court excluded from the consideration of the jury all portions of the dying declaration which were immaterial and incompetent. State v. Elkins, 101 Mo. 344; State v. Garth, 164 Mo. 553; State v. Parker, 172 Mo. 191; State v. Draper, 65 Mo. 340.

FOX, J.—This cause is in this court by appeal on the part of the defendant from a conviction of murder of the first degree from the criminal court of Greene

county, Missouri. The prosecution is based upon an information, duly verified by the prosecuting attorney, and as its validity is not challenged, it can serve no useful purpose to reproduce it.

The facts of this case, as developed at the trial, on the part of the State, may be briefly stated as follows:

The difficulty occurred in the city of Springfield, Greene county, Missouri, at the Queen City restaurant, on the 27th day of October, 1903. The evidence shows that Tom Brown is a negro and that the deceased, W. W. Weir, was a white man; at the time of the difficulty the deceased was employed as a dishwasher in the Queen City restaurant, working at night; it appears that the restaurant had but two rooms and that in the kitchen was a table where negroes were served; the kitchen was a small room, seventeen by twenty feet. On the night of the difficulty Tom Brown entered the restaurant and ordered a dish of oysters, taking a seat at the serving table in the kitchen; in the kitchen, aside from the serving table in the center, there was a dishwashing table and a range. In the restaurant, when Brown entered, were Huffman, the cook, Weir, the dishwasher, and Frank Wofford, the waiter. Brown entered the restaurant between twelve and one o'clock at night; he was known to all persons about the restaurant, as he had been in the habit of eating night lunches there. It appears that Weir was a one-legged man and used a crutch. The evidence shows that after Brown had eaten his oysters, Weir, who was sitting at the dishwashing table, was taken with a fit of coughing or sneezing, and Brown said to him, "What in the hell is the matter with you, do you feel better?" and Weir replied, "Go on and leave me alone, I am not bothering you." Brown said, "By God, he didn't have to go out until he got ready." When the talking began Brown was seated at the table and Weir was washing dishes; Weir got up, walked five or six feet and reached for his crutch which was sitting on the dishwashing

table, walked back and leaned up against the table. Brown said, "Hold on here, you don't know who I am," to which Weir replied, "Yes, you are a nigger." Brown moved in the direction of Weir, who shoved up his crutch on a level with Brown's chin, and the witness says he thought it struck his chin; Brown took a revolver from his pocket and holding it in both hands, pointed it at Weir and fired, shooting him in the abdomen, causing a wound which extended through the body, and the bullet lodged in the back and on the right side. Weir was removed to a hospital, where he died from the effect of the wound on the 28th day of October, 1903.

Brown immediately left the restaurant with his pistol in his pocket and was not located until about two o'clock in the afternoon following the morning of the shooting. When found he was locked in a room, lying on the floor asleep; his revolver was found on the floor by his side. Brown stated to the officers arresting him, "Well, you got my gun. I guess you got me. If I had got my gun first we would had a happy moment here, we would all die together."

The revolver, which was a 38-calibre Colts, had six chambers, five of which were loaded and one empty, was introduced in evidence at the trial, and identified as having been taken from Brown at the time of his arrest.

William Reese, testifying in behalf of the State, stated that he was engaged as a hack driver in the city of Springfield at the time of the difficulty; that he met the defendant about 8 o'clock that evening, and he engaged him to take him to a colored dance; said he wanted to be there at 11 o'clock; at 11 o'clock he called for the defendant, and that the defendant went into the Frisco saloon, saying he wanted to get a drink of gin and a half pint of gin. That on that night he was driving a team of black horses, one of them being named "Tom" and the other "Nick;" that he did not

know the defendant's name was Tom.  Reese stated
that when Brown came out of the saloon and started
to step up on the hack one of the horses started up,
and addressing the horses he said: "Whoa, Tom, you
black son-of-a-bitch; I will break this crutch over you."
The witness stated that he looked up and as he did so
the defendant had a gun in his hand and addressing
him said, "Was you speaking to me?" to which he re-
plied, "No."   On the way to the dance Reese engaged
in a conversation with the defendant and spoke about
a quarrel he had gotten into that night, when the de-
fendant remarked, "I am your friend; I am with you;
I like you.  If you kill a dozen to-day I don't know any-
thing about it, and they can't make me tell anything,
and if I kill three or four they can't make you tell."

This evidence was objected to by the defendant;
the objection was overruled and exceptions saved.

Ike Walker, another witness testifying in behalf
of the State, stated that he was a hack driver in the
city of Springfield on the night of the difficulty, and
that he drove the defendant home from the dance be-
tween half past twelve and one o'clock on that night,
and in a conversation the defendant showed him a pis-
tol and remarked that there couldn't no son-of-a-bitch,
black or white, do anything to him or run a bluff over
him.  This evidence was also objected to by the defend-
ant, which objection was overruled, to which the de-
fendant excepted.

The State further offered George W. Arnold, clerk
of the criminal court, who reduced to writing the dying
declarations of the deceased.  Arnold states that in
taking the declarations of the deceased he wrote them
down as near as he could as dictated by the defendant.
The State then offered the dying declarations, over the
objections of the defendant, which are as follows:

"Said William W. Weir states and declares that
he is now sick and nigh unto death, and is fully aware
that his death is now certainly approaching him in his

present condition from a mortal wound inflicted upon his person, it being a pistol wound, at the time fired upon him by one Tom Brown. The said Tom Brown was under the influence of liquor and was cursing and swearing. I told him to stop swearing and at this moment said Tom Brown started towards me, when I threw up my crutch to ward him off, when he drew a revolver from his pocket and fired upon me. He was then six or eight feet away from me; he answered when I told him to stop that swearing by saying, 'You go to hell, I will talk all I want to.' He then walked out of the restaurant quite hastily. At the time said Tom Brown was approaching me I jabbed him with my crutch, as he came toward me. He was sitting at the table when I first spoke to him, and as he arose from the table he was reaching in his pocket for his revolver; at the time said Tom Brown fired the pistol, he said 'God damn you, I will talk all I want to.'

(Signed.)                              "W. W. WEIR."

The defendant introduced testimony showing his good reputation as a peaceable, quiet citizen; also evidence showing his good reputation for truth and veracity.

The defendant, testifying in his own behalf, stated that he went into the restaurant on the night of the difficulty to get something to eat as was his custom, and sat down at the order table in front of the range; that he and deceased were on friendly terms. That the first thing that attracted his attention to Weir, he was vomiting, and after he got through he addressed him saying, "You got a pretty good load on, you feel better if you throw up;" that Weir then commenced mumbling something; that he remarked, "Now Major, I called him General, you know I don't mean any harm," when the deceased jumped up and grabbed his crutch and said, "I don't allow no nigger to talk to me; no damn nigger to talk to me," just that way. "He was kinda northwest of me and so I had to look

around at him; I seen he was fixing to strike me and I jumped up, and as I got to my feet he struck me on the side of the jaw with his crutch. I got excited over it and was trying to get out of the way and dodge his lick. Q. What happened then? A. Then he jumped from the northwest corner down to the east, north corner, and raised his crutch and hit me again, and I throwed up this gun; just snatched the gun out of my pocket and pointed it towards him.''

The defendant stated that when he rose from his position at the table it carried him a little bit toward the deceased, and that the deceased was then coming toward him with his crutch in his hand. In response to the question: "Do I understand he had already struck you or not?" the defendant replied; "Yes, sir, he struck me angling across the table." Defendant further stated that the pistol with which the shooting was done was the property of Frank King.

On cross-examination, in answer to the question, "Why did you shoot Mr. Weir?" the defendant answered, "Because through excitement."

At the close of all the evidence the court instructed the jury upon murder of the first and second degrees, manslaughter of the fourth degree, and self-defense. The cause was submitted to the jury and they returned their verdict finding the defendant guilty of murder of the first degree.

Judgment and sentence was accordingly entered, from which judgment the defendant appeals.

### OPINION.

Counsel for appellant assign numerous errors committed by the trial court as furnishing a basis for the reversal of this judgment.

It is needless to say that this is an important case; the life of a citizen is involved, and in the discharge of the important duty of reviewing this trial, we shall give to the complaints of appellant careful considera-

tion, and closely scrutinize the disclosures of the record to the end of ascertaining, under our system of criminal jurisprudence, whether or not he has had a fair and impartial trial.

The first complaint to which our attention is directed, is the refusal of the court to sustain the challenge for cause of certain members of the panel of jurors, from which the twelve jurors were to be selected to try the cause. Upon the subject of qualifications of jurors in the trial of causes, section 2616, Revised Statutes 1899, provides that, "If it appear that such opinion is formed only on rumor and newspaper reports, and not such as to prejudice the mind of the juror, he may be sworn." Juror J. R. Heard, upon his *voir dire* examination, stated in response to a question as to his prejudice against the negro race, that he had some. However, this answer was qualified by the statement substantially that he had no such bias or prejudice that would prevent him from impartially trying the case under the law and evidence. We have carefully read the examination of this juror, and while he frankly admits some prejudice against the race to which defendant belongs, yet when his examination as a whole is considered, it is apparent that he had no prejudice against the defendant, and his open, frank statements indicate a high sense of integrity and fairness, and his statement to the court that he could fairly and impartially try this case without any bias or prejudice, furnished sufficient reason for denying the challenge of appellant to this juror. The statement of this juror as to his attitude toward the colored race must be treated as nothing more than a notification to the appellant that, while he had no prejudice against him, and could fairly and impartially try his case, yet in making his peremptory challenges, the fact of the juror not being favorably impressed with the negro race, might be taken into consideration. Technically, this juror was not disqualified; but as

this case is to be retried, it would be more in harmony with absolute impartiality to select a panel of jurors who have no unkindly feeling toward the class to which defendant belongs, and who have not formed or expressed such opinions in respect to the guilt of the defendant as would require testimony to remove them.

As to the jurors, Wilson and Haynie, it is sufficient to say that an analysis of their examination upon their *voir dire,* discloses no legal grounds for sustaining the challenge of appellant as to them. They were clearly qualified jurors under the repeated and uniform announcement of this court of the rules upon the subject of qualification of jurors. [State v. Elkins, 101 Mo. 344; State v. Bryant, 93 Mo. 273; State v. Cunningham, 100 Mo. 382.]

This brings us to the consideration of the question of the admissibility of the dying declarations of deceased, herein fully set forth. There is no subject connected with the administration of the criminal laws of this State that has more frequently had the attention of this court than that of the admissibility of dying declarations in cases of homicide. Upon this subject this court has dealt with every form of objection which could be conceived by the ingenuity of the legal profession, and as to the underlying principles which authorize the admission of this class of testimony nothing can be added to the repeated and uniform expressions of this court. The fundamental rule governing their admissibility is that it must appear by proof adduced by the party offering such declarations, that they were made under a sense of impending death, and it is sufficient if it satisfactorily appears, in any mode, that they were made under that sanction. No particular form in the statement of dying declarations is required. As was said by SHERWOOD, J., in State v. Nocton, 121 Mo. 550: ''A declaration may be received in evidence even without such formal statement. Thus, though 'it is essential to the admissibility of these declarations, and

is a preliminary fact to be proved by the party offer-
ing them in evidence, that they were made under a
sense of impending death; but it is not necessary that
they should be stated, at the time; to be so made.  It
is enough, if it satisfactorily appears, in any mode,
that they were made under that sanction; whether it
be directly proved by the express language of the de-
clarant, or be inferred from his evident danger, or the
opinions of the medical or other attendants, stated to
him, or from his conduct, or other circumstances of the
case, all of which are resorted to, in order to ascertain
the state of the declarant's mind.  The length of time
which elapsed between the declaration and the death
of the declarant furnishes no rule for the admission or
rejection of the evidence; though, in the absence of
better testimony, it may serve as one of the exponents
of the deceased's belief, that his dissolution was, or was
not, impending.  It is the impression of almost imme-
diate dissolution, and not the rapid succession of death,
in point of fact, that renders the testimony admissible.
[1 Greenleaf on Ev. (14 Ed.), sec. 158; 3 Russell on
Crimes (9 Am. Ed.), 250; 6 Am. and Eng. Ency. of
Law, p. 108, et seq., and cases cited.]''

The application of the principles announced in that
case to the disclosure of the record upon this subject,
must furnish the solution of this proposition.  Upon
the facts disclosed by the record, that deceased, at the
time of making the dying declarations offered in evi-
dence, was in the presence of almost immediate dissolu-
tion, there can be no dispute.  The physician who at-
tended him immediately after the fatal shot, described
fully the nature and character of the wound and posi-
tively stated that it was necessarily fatal.  Added to
this is the statement of the deceased that ''he was nigh
unto death and fully aware that death was certainly
approaching.''  In our opinion this disclosure of the
record furnishes a reasonable preliminary foundation
for the introduction of the declaration introduced in

evidence.   Death soon followed the making of the declarations by the deceased, and as was said in State v. Nocton, supra, serves as one of the exponents of the deceased's belief that his dissolution was impending.

We have carefully considered the statements by the deceased as contained in the dying declarations offered in evidence, and find there is no merit in the contention by the appellant that such statements were but conclusions of the deceased and not a statement of facts.   Our attention is specially directed to that clause of the statement in which the deceased, in speaking of the defendant, says, "As he arose from the table he was reaching in his pocket for his revolver."   It is earnestly insisted that this was a mere statement of a conclusion.   We are unable to give our assent to this insistence.   It is very clearly a statement of fact describing the act of the defendant in getting his revolver from his pocket, and the fact that he did get his revolver and shot the deceased, clearly demonstrates the truth of the statement of fact that he was reaching for his revolver.   There was no error in the admission of the dying declarations as introduced by the State.

This leads us to the consideration of the most serious proposition urged by counsel for appellant, that is, the improper admission of incompetent and irrelevant testimony.   Witness Ralph Reese, a hack driver, was permitted over the objection of the defendant, to testify to the occurrence of the defendant getting into his hack about 11 o'clock the night of the homicide to go to a dance.   The witness says that he was driving a black team of horses; that one of them was named Tom and the other Nick; that he did not know that defendant's name was Tom, and the witness then states that about the time the defendant was getting into the hack, the horses started up and he said, "Whoa, Tom, you black son-of-a-bitch, I will break this crutch over you."   Witness then states that he looked up and defendant had a gun and said, "Was you speaking to

me?" and the witness said, "No." Defendant then went with the witness on the hack to the dance. We are unable to comprehend what this occurrence, which was exclusively between the hack driver and the defendant, had to do with the killing of the deceased. Upon the use of the rough terms by the hack driver to one of his horses which bore the same name as defendant, the defendant, doubtless thinking the violent language applicable to him, presented his pistol and demanded to know of the driver if he was speaking to him, and the driver said no, and that ended that particular episode. Technically, the conduct of the defendant in presenting his pistol immediately following the use of the harsh terms, amounted to an assault upon the driver, and clearly the purpose of the State in introducing it was to show such assault. We are then confronted with the proposition, was it competent or relevant, or did it tend to prove any of the elements of the offense charged, for the State to show such separate and distinct assault upon another person? We have reached the conclusion that it was not, and that this part of the occurrence between the hack driver and the defendant was clearly inadmissible and should have been excluded. It may be said that this occurrence amounted to nothing other than the presentment of a pistol by the defendant. But let us illustrate this proposition. Suppose the defendant had not only presented his pistol, but fired it at the driver, would it be seriously considered or contended for a moment that this would have been competent upon the trial of this charge upon which defendant was convicted? Certainly not—no part of that occurrence would have been admissible. Then we are unable to understand, if the completed act, the presenting of the pistol and shooting at the hack driver, would be incompetent upon the issues presented in this cause, upon what principle the commission of a part of the act would be competent or relevant to such issues. That this was regarded as a

dispute or trouble between the defendant and hack driver, and exclusively applicable to them, is made manifest by the driver's response to the question as to whether he had ever had any trouble with the defendant, and the answer was, none, except that trouble referred to about defendant presenting his pistol on the night spoken of by the witness. That his testimony was incompetent and irrelevant upon the issues presented by the charge in the information, we have no doubt; the only question about which we entertain a doubt is, was its admission prejudicial error? Whenever error is committed in the trial of a criminal cause presumptively it is prejudicial, and unless it is made manifest by the disclosures of the entire record that such error could not have reasonably resulted in any harm to the defendant, it will be so treated by the appellate court.

We have in this case a charge of murder; as to the killing there is no dispute, but the jury are required to consider all the facts and determine the existence or non-existence of the other elements of the offense, such as malice, premeditation and deliberation. Among the facts submitted to the jury for the purpose of determining the essential elements of murder of the first degree, the court erroneously permits a witness to detail an occurrence between the witness and the defendant in which the defendant, upon the hearing of harsh words by the witness, supposed to be applicable to him, "whips out his pistol," and presents it towards the witness, demanding to know at the same time, "Do you say me," it being an occurrence entirely disconnected with the homicide for which the defendant was being tried—can it be said that such testimony was harmless and did not in any manner influence the jury in reaching their verdict? We think not, or at least from the record before us we are unable to say that it did not operate to his injury, and a human life being involved, the doubt or uncertainty as to the effect of this incompetent testimony, upon the

minds of the jury, should be resolved in favor of the defendant. The court having permitted this testimony to go to the jury, although entirely disconnected with the condition surrounding the homicide, it was but natural for the jury to take it into consideration in reaching their conclusions upon the elements of the offense charged and of which defendant was convicted.

The conduct of the defendant in presenting his pistol and demanding to know of witness Reese if he meant him, when using the harsh terms, was applicable alone to that particular occurrence. Its admission as evidence in this cause constituted error. That occurrence was unlike the general statements subsequently made by the defendant to witnesses Reese and Walker. The subsequent conversation with Reese, after getting into the hack, and on the way to the dance, as well as the statements detailed by witness Walker, were competent, as indicating the existence of a frame of mind or disposition from which criminal actions proceed, and the action of the court in overruling the objections of defendant to the introduction of those statements is fully supported by the rule as announced upon this subject in State v. Grant, 79 Mo. l. c. 137; State v. Guy, 69 Mo. 430; State v. Hamilton, 170 Mo. 377.

There is no merit in the complaint of error urged as to the closing sentence of instruction numbered 2, in which the jury are told "that if they can satisfactorily and reasonably infer the existence of deliberation and premeditation, then they would be warranted in finding the defendant guilty of murder of the first degree." This instruction has repeatedly had the approval of this court; it in plain and unambiguous terms requires the jury to find every essential element of the offense, and in concluding correctly told them that "while it devolves upon the State to prove the willfulness, deliberation, premeditation and malice aforethought, all of which are necessary to constitute mur-

der in the first degree, yet these need not be proved by direct evidence, but may be deduced from· all the facts and circumstances attending the killing; and if you can satisfactorily and reasonably infer their existence from the evidence, you will be warranted in finding the defendant, Tom Brown, guilty of murder in the first degree."

Appellant insists that instruction numbered 6 given by the court, defining manslaughter, was not broad enough, and failed to make proper application of the facts to that particular grade of the offense.

An examination of the record makes it manifest that counsel for appellant has overlooked instruction number 7, which clearly and in a very practical manner, applies the facts as developed at the trial to the offense of manslaughter. It is conceded that instruction number 6, as an abstract proposition, correctly defines manslaughter. This is followed by instruction numbered 7, which plainly applies the facts to that grade of the crime charged. It was as follows: "If the jury believe from the evidence that the deceased struck the defendant with his crutch and that defendant upon such provocation in hot blood shot and killed the deceased through passion thus aroused, but not in the necessary self-defense, as self-defense is defined by the other instructions, herein, then you will find the defendant guilty of manslaughter in fourth degree." In our opinion this fully meets the objection to the instruction to which the complaint is directed. The two instructions must be read together. By so doing the law as applicable to that grade of offense is fully covered. While it may be that it would be more in harmony with approved precedent to have plainly told the jury that if the deceased struck the defendant with his crutch, such striking was a sufficient provocation to reduce the grade of the offense, if the jury should find from the evidence that the defendant, by reason of such provocation, and in a heat of passion aroused by it, without malice and

premeditation, shot and killed the deceased, but not in necessary self-defense, as it is defined in other instructions, then the offense was that of manslaughter of the fourth degree; yet we are of the opinion that the instruction in the form as given was substantially correct.

We have thus given expression to our views upon the trial of this cause in the trial court, as the same is disclosed by the record, and have indicated the errors which necessitate a retrial of this cause. If the defendant is guilty of willful, premeditated and deliberate murder, he should suffer the penalty for such offense, but the infliction of such penalty by the officers of the law must find its justification alone upon an absolutely fair and impartial trial.

For the errors as herein indicated, the judgment in this cause should be reversed and the cause remanded for a new trial. It is so ordered.

*Gantt, J.,* concurs; *Burgess, P. J.,* absent.