ALDRIDGE *v.* UNITED STATES.

No. 683.   Argued March 16, 1931.—Decided April 20, 1931.

---

[12] *United States* v. *Cerecedo Hermanos,* 209 U. S. 337; *National Lead Co.* v. *United States,* 252 U. S. 140.

*Mr. James F. Reilly* for petitioner.

*Mr. Leo A. Rover,* United States Attorney for the District of Columbia, with whom *Mr. Neil Burkinshaw,* Assistant United States Attorney, was on the brief, for the United States.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

The petitioner was convicted, in the Supreme Court of the District of Columbia, of murder in the first degree and was sentenced to death. The conviction was affirmed by the Court of Appeals. This Court granted a writ of certiorari, limited to the question raised by the exception to the ruling of the trial court on the examination on *voir dire* of prospective jurors.

The petitioner is a negro, and the deceased was a white man, a member of the police force of the District. The record shows the following proceedings on the examination of jurors on the *voir dire*:

The court " inquired if any of them knew the defendant, Alfred Scott Aldridge, or his counsel, or any of the witnesses whose names have been called. The court further inquired if any of the prospective jurors knew any of the facts in the case or if any of them ever remembered having read of it in the newspaper, or if they had any prejudice or bias against circumstantial evidence, or if any of the prospective jurors had any conscientious scruples against capital punishment. The court further inquired if any prospective juror had formed or exercised an opinion as to the guilt or innocence of the defendant, and further inquired whether any prospective juror was acquainted with any member of the Metropolitan Police Force of the District of Columbia, or more particularly those attached to the third precinct.

" Whereupon, with the consent of the court, counsel for the parties hereto approached the bench and in a whispered tone, out of the hearing of the prospective jurors, the following took place:

" Mr. Reilly. At the last trial of this case I understand there was one woman on the jury who was a southerner, and who said that the fact that the defendant was a negro and the deceased a white man perhaps somewhat influenced her. I don't like to ask that .question in public, but——

" The Court. I don't think that would be a proper question, any more than to ask whether they like an Irishman or a Scotchman.

" Mr. Reilly. But it was brought to our attention so prominently. It is a racial question——

. " The Court. It was not this jury.

" Mr. Reilly. No. But it was a racial question, and the question came up——

" The Court. I don't think that is proper..

" Mr. Reilly. Might I, out of an abundance of caution, note an exception.

" The Court. Note an exception.

" Counsel for the defendant requested the court to allow the record to show that the question relative to racial prejudice .be propounded to each and every prospective juror, with the exception heretofore noted on behalf of the defendant."

In accordance with the existing practice, the questions to the prospective jurors were put by the court, and the court had a broad discretion as to the questions to be asked. The exercise of this discretion, and the restriction upon inquiries at the request of counsel, were subject to the essential demands of fairness. We find no reason to doubt the nature of the inquiry which the counsel for the accused desired. It was admitted at the bar of this Court that the members of the jury were white. In ask-

ing that the question relative to "racial prejudice" be put to the jurors, it is only reasonable to assume that counsel referred, not to immaterial matters, but to such a prejudice as would disqualify a juror because precluding an impartial verdict. The reference to what counsel had heard as to the attitude of a juror on the previous trial, where the jury had disagreed, indicated the purpose of the question, which was clear enough to invite appropriate action by the court. If the court had permitted the question, it doubtless would have been properly qualified. But the court, interrupting counsel, disposed of the inquiry summarily. The court failed to ask any question which could be deemed to cover the subject. If the defendant was entitled to have the jurors asked whether they had any racial prejudice, by reason of the fact that the defendant was a negro and the deceased a white man, which would prevent their giving a fair and impartial verdict, we cannot properly disregard the court's refusal merely because of the form in which the inquiry was presented.

The propriety of such an inquiry has been generally recognized. In *Pinder* v. *State,* 27 Fla. 370; 8 So. 837, the counsel for the accused sought to have the jurors asked on their *voir dire:* " Could you give the defendant, who is a negro, as fair and as impartial a trial as you could a white man, and give him the same advantage and protection as you would a white man upon the same evidence? " The Supreme Court of Florida held that the refusal of the court to allow the question was error and reversed the conviction.[1]   In *Hill* v. *State,* 112 Miss. 260; 72 So. 1003, the

___

[1] In the *Pinder* case, *supra,* the court said: " Though the question is not in express terms provided for in the statute above cited " (McClellan's Digest, § 10, p. 446) " yet it was a pertinent, and, as we think, proper question, to test fully the existence of bias or prejudice in the minds of the jurors. It sought to elicit a fact that was of the most vital import to the defendant; and a fact, too, that if existent, was locked up entirely within the breasts of the jurors to

Supreme Court of Mississippi held that it was fatal error
to refuse to permit a negro on trial for murder to put to
prospective jurors on their *voir dire* the following question:
" Have you got any prejudice against the negro, as a negro,
that would induce you to return a verdict on less or slighter
evidence than you would return a verdict of guilty against
a white man under the same circumstances? " The Su-
preme Court of North Carolina reversed the conviction of
a negro because of the refusal of the trial judge to permit
a juror to be asked if " he believed he could, as a juror,
do equal and impartial justice between the State and a
colored man." *State* v. *McAfee*, 64 N. C. 339.[2] See, also,

---

whom the question was propounded; a knowledge of the existence of
which could only be acquired by interrogating the juror himself.
The answer to it if in the affirmative could have worked no harm to
the juror or to anyone else, but would have done credit to the
humanity and intelligence of the juror, and would have satisfactorily
exhibited to the court and to the defendant his entire competency,
so far as the element of bias or prejudice was involved. But, if the
answer to it from the jurors had been in the negative, then, we have
no hesitancy in saying that it would have shown them to be wholly
unfit and incompetent to sit upon the trial of a man of the negro
race, whose right to a trial by a fair and impartial jury is as fully
guaranteed to him under our constitution and laws, as to the whitest
man in Christendom. And such incompetency asserts itself with
superadded force in such a case as this where the life or death of the
defendant was the issue to tip the scale in the jury's hands for
adjustment."

[2] In that case, the court said (at p. 340): " It is essential to the
purity of trial by jury, that every juror shall be free from bias. If
his mind has been poisoned by prejudice of any kind, whether result-
ing from reason or passion, he is unfit to sit on a jury. Here, his
Honor refused to allow a proper question to be put to the juror, in
order to test his qualifications. Suppose the question had been
allowed, and the juror had answered, that the state of his feelings
toward the colored race was such that he could not show equal and
impartial justice between the State and the prisoner, especially in
charges of this character, it is at once seen that he would have been
grossly unfit to sit in the jury box."

*Fendrick* v. *State,* 39 Tex. Cr. 147; 45 S. W. 589; *State* v. *Sanders,* 103 S. C. 216; 88 S. E. 10.

The practice of permitting questions as to racial prejudice is not confined to any section of the country, and this fact attests the widespread sentiment that fairness demands that such inquiries be allowed. Thus, in New York, on the trial of a negro for the murder of his wife, who was white, a talesman, who had testified to a disqualifying prejudice, was excluded by the court on its own motion, and the Court of Appeals held that the exclusion was not error, although in the absence of a challenge to the talesman by either party. *People* v. *Decker,* 157 N. Y. 186, 190; 51 N. E. 1018. See, also, *State* v. *Brown,* 188 Mo. 451, 459, 460; 87 S. W. 519.

The right to examine jurors on the *voir dire* as to the existence of a disqualifying state of mind, has been upheld with respect to other races than the black race, and in relation to religious and other prejudices of a serious character. *Potter* v. *State,* 86 Tex. Cr. 380, 384; 216 S. W. 886; *People* v. *Reyes,* 5 Cal. 347, 349; *Watson* v. *Whitney,* 23 Cal. 375, 379; *People* v. *Car Soy,* 57 Cal. 102; *Horst* v. *Silverman,* 20 Wash. 233, 234; 55 Pac. 52. In *People* v. *Reyes, supra,* Mexicans were charged with assault with intent to commit murder, and conviction was reversed because of the refusal to allow questions to determine whether a prospective juror was a member of the Know Nothing party, and whether he had taken any oath or obligation which resulted in prejudice, or whether independent of such an oath he entertained a prejudice, which would prevent him from giving the accused a fair trial.[3]

---

[3] The court in that case said (at p. 349): "As the juror best knows the condition of his own mind, no satisfactory conclusion can be arrived at, without resort to himself. Applying this test then, how is it possible to ascertain whether he is prejudiced or not, unless questions similar to the foregoing are propounded to him? . . .

" Prejudice being a state of mind more frequently founded in passion than in reason, may exist with or without cause; and to ask

We do not overlook the reference of the Court of Appeals, in support of the ruling of the trial court, to conditions in the District of Columbia " where the colored race is accorded all the privileges and rights under the law, that are afforded the white race, and especially the right to practice in the courts, serve on the jury, etc." But the question is not as to the civil privileges of the negro, or as to the dominant sentiment of the community and the general absence of any disqualifying prejudice, but as to the bias of the particular jurors who are to try the accused. If in fact, sharing the general sentiment, they were found to be impartial, no harm would be done in permitting the question; but if any one of them was shown to entertain a prejudice which would preclude his rendering a fair verdict, a gross injustice would be perpetrated in allowing him to sit. Despite the privileges accorded to the negro, we do not think that it can be said that the possibility of such prejudice is so remote[4] as to justify the risk in forbidding the inquiry. And this risk becomes most grave when the issue is of life or death.

The argument is advanced on behalf of the Government that it would be detrimental to the administration of the

---

a person whether he is prejudiced or not against a party, and (if the answer is affirmative), whether that prejudice is of such a character as would lead him to deny the party a fair trial, is not only the simplest method of ascertaining the state of his mind, but is, probably, the only sure method of fathoming his thoughts and feelings. If the person called had not taken an obligation which would prejudice him against foreigners in such a manner as to imperil their rights in a court of law, he could say so, and the question and answer would be harmless. If, upon the other hand, he had taken oaths, and was under obligations which influenced his mind and feelings in such a manner as to deny to a foreigner an impartial trial, he is grossly unfit to sit as a juror, and such facts should be known."

[4] For an illustration of a case where the suggestion of bias was held to be too remote, e. g., as to political affiliations, see Connors v. United States, 158 U. S. 408.

law in the courts of the United States to allow questions to jurors as to racial or religious prejudices. We think that it would be far more injurious to permit it to be thought that persons entertaining a disqualifying prejudice were allowed to serve as jurors and that inquiries designed to elicit the fact of disqualification were barred. No surer way could be devised to bring the processes of justice into disrepute.

We are of the opinion that the ruling of the trial court on the *voir dire* was erroneous and the judgment of conviction must for this reason be reversed.

*Judgment reversed.*

MR. JUSTICE MCREYNOLDS, dissenting.

Our jurisdiction over this case is limited by § 391, Title 28, U. S. Code, which provides—

"All United States courts shall have power to grant new trials, in cases where there has been a trial by jury, for reasons for which new trials have usually been granted in the courts of law. On the hearing of any appeal, certiorari, writ of error, or motion for a new trial, in any case, civil or criminal, the court shall give judgment after an examination of the entire record before the court, without regard to technical errors, defects, or exceptions which do not affect the substantial rights of the parties."

The petitioner, a negro, killed a white policeman in the District of Columbia. He was indicted, tried and found guilty by a jury. He moved for a new trial upon the ground, among others, " That this court committed error. in refusing to examine the jury on their *voir dire* as to whether any juror may entertain racial prejudice in a matter of homicide where the defendant is a negro and the deceased a white policeman." This was overruled and sentence of death followed.

Upon appeal to the Court of Appeals for the District the following error, among others, was assigned: " The

court's action in refusing the request of the defendant to propound to the jury during the court's examination of the jury on its *voir dire* as to whether any juror may entertain racial prejudice in the matter of a homicide where the defendant is a negro and the deceased a white policeman."

Replying to this that court said—

" Counsel for defendant assigns as error the refusal of the court to allow him to inquire of the prospective jurors on their *voir dire* whether they entertained racial prejudice in a case wherein the defendant is a negro and the deceased a white man. We had occasion to consider this same question in the case of *Crawford* v. *United States*, 59 App. D. C. 356. We have given the matter further careful consideration in this case and find no reason to recede from our former decision. In a jurisdiction like the District of Columbia, where the colored race is accorded all the privileges and rights under the law, that are afforded the white race, and especially the right to practice in the courts, serve on the jury, etc., we are of the opinion that there was no abuse of discretion on the part of the trial court in refusing to permit the question to be answered by the jurors."

This Court granted a certiorari to bring up the judgment of affirmance but limited review to the point raised by the quoted assignment of error.

It appears that while the trial judge was examining prospective jurors on their *voir dire,* counsel for the accused said to him: "At the last trial of this case I understand there was one woman on the jury who was a southerner, and who said that the fact that the defendant was a negro and the deceased a white man perhaps somewhat influenced her. I don't like to ask that question in public." The precise nature of " that question " is unknown to us. The Judge thought " that question " (whatever it was) improper and refused to ask it. Whereupon counsel noted an exception and " requested the court to allow the

record to show that the question relative to racial prejudice be propounded to each and every prospective juror, with the exception heretofore noted on behalf of the defendant."

Solely because of the refusal of the trial judge to propound an undisclosed question "relative to racial prejudice," (whatever that may be) we are asked to upset a judgment approved by the judges of both local courts who, it is fair to presume, understand conditions in the District better than we do.

Nothing is revealed by the record which tends to show that any juror entertained prejudice which might have impaired his ability fairly to pass upon the issues. It is not even argued that considering the evidence presented there was room for reasonable doubt of guilt.

It does appear that counsel said he understood at a former trial a female juror, a southerner, (whatever that may mean) declared " the fact the defendant was a negro and the deceased a white man perhaps somewhat influenced her." And that is the sum of the information to be gathered from the record in respect of any " race prejudice " which might have so distorted some juror's judgment as to prevent honest and fair consideration.

How this unidentified woman juror voted; whether she was white or black; whether her prepossessions were right or wrong or materially different from those generally entertained by men of one color towards those of another; we cannot know. But " perhaps she was somewhat influenced " by the fact that the dead man and the defendant were of different color. Must we therefore decide that " perhaps " and accordingly some member of the second jury failed to act fairly, intelligently, and without due regard to his oath!

Two local courts could not conclude that there was adequate reason for holding the accused man had suffered deprivation of any substantial right through refusal by

the trial judge to ask prospective jurors something relative to racial prejudice. And certainly I am unable to affirm that they were wrong.

Section 391 of the U. S. Code, I think, was intended to prevent escape of culprits from prompt, deserved punishment in cases like this. Congress had clear right to put the limitation on courts of review and the enactment should be given effect according to its purpose.

Unhappily, the enforcement of our criminal laws is scandalously ineffective. Crimes of violence multiply; punishment walks lamely. Courts ought not to increase the difficulties by magnifying theoretical possibilities. It is their province to deal with matters actual and material; to promote order, and not to hinder it by excessive theorizing of or by magnifying what in practice is not really important.

I think the judgment below should be affirmed.