**[J-58A-2018, J-58B-2018 and J-58C-2018] [MO: Todd, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 756 CAP |
| | : | |
| Appellee | : | Appeal from the Judgment of |
| | : | Sentence entered on December 9, |
| | : | 2016, in the Court of Common Pleas, |
| v. | : | Philadelphia County, Criminal Division |
| | : | at No. CP-51-CR-0002231-2015. |
| | : | (Post Sentence Motions denied on |
| TAM M. LE, | : | May 30, 2017.) |
| | : | |
| Appellant | : | ARGUED: September 25, 2018 |

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 757 CAP |
| | : | |
| Appellee | : | Appeal from the Judgment of |
| | : | Sentence entered on December 9, |
| | : | 2016, in the Court of Common Pleas, |
| v. | : | Philadelphia County, Criminal Division |
| | : | at No. CP-51-CR-0002232-2015. |
| | : | (Post sentence motions denied on |
| TAM M. LE, | : | May 30, 2017.) |
| | : | |
| Appellant | : | ARGUED: September 25, 2018 |

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 758 CAP |
| | : | |
| Appellee | : | Appeal from the Judgment of |
| | : | Sentence entered on December 9, |
| | : | 2016, in the Court of Common Pleas, |
| v. | : | Philadelphia County, Criminal |
| | : | Division, at No. CP-51-CR-0002233- |
| | : | 2015. (Post sentence motions denied |
| TAM M. LE, | : | on May 30, 2017.) (Same criminal |
| | : | episode pursuant to Pa.R.A.P. |
| Appellant | : | 702(b).) |
| | : | |
| | : | ARGUED: September 25, 2018 |

## CONCURRING AND DISSENTING OPINION

**JUSTICE WECHT**                                    **DECIDED: May 31, 2019**

I join in the Majority's rejection of Tam Le's guilt phase claims.

I respectfully dissent from the Majority's decision to deny Le penalty phase relief. A juror who automatically will vote for the death penalty is not impartial.[1] It has long been established that a defendant is entitled to inquire into venirepersons' ability to impose a sentence based upon the facts of the case and the trial court's instructions.[2] As a matter of law, a defendant may pose questions designed to uncover bias tied to critical facts that may be so influential that prospective jurors will be unable to render a fair and impartial verdict despite following the court's instructions.

In this capital case, Le sought to question prospective jurors concerning Le's prior conviction for voluntary manslaughter. The trial court refused. The Majority upholds this refusal. In my view, the right to an impartial jury warrants reversal. This result flows inexorably from the principle that case-specific questions are often essential to satisfying the requirement of an impartial jury.

"A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 (1955). The Sixth Amendment and the Fourteenth Amendment require the impartiality of any jury empaneled in a criminal case. *Morgan v. Illinois*, 504 U.S. 719, 727-28 (1992); *Turner v. Louisiana*, 379 U.S. 466 (1965); *Irvin v. Dowd*, 366 U.S. 717 (1961). The primary means by which we ensure a defendant's right to an impartial jury is through voir dire. Without adequate voir dire, the trial court is unable to remove prospective jurors who will not be impartial. *Morgan*, 504 U.S. at 729. Due process

---

[1]     *Morgan v. Illinois*, 504 U.S. 719, 729 (1992).

[2]     *Id.* at 723 (holding that the defendant was entitled to life-qualify the venire by asking "[i]f you found [the defendant] guilty, would you automatically vote to impose the death penalty no matter what the facts are?").

requires that voir dire be sufficiently flexible to allow the parties and the trial court to ferret out bias on the part of prospective jurors. *Rosales–Lopez v. United States*, 451 U.S. 182, 188 (1981). For this reason, the trial court's exercise of discretion in supervising voir dire is subject to the essential demands that fairness imposes. *Morgan*, 504 U.S. at 730 (quoting *Aldridge v. United States*, 283 U.S. 308 (1931)).

In *Wainwright v. Witt*, 469 U.S. 412 (1985), the Supreme Court of the United States held that "the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Id*. at 424 (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). A juror who will never vote for capital punishment is not impartial, and must be removed for cause. *Morgan*, 504 U.S. at 728. Likewise, a juror who will vote to impose death automatically in every case of first-degree murder must be removed for cause. *Id*. at 728-29, 732-33. As the United States Supreme Court has explained,

> A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror. Therefore, based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such views. If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence.

*Morgan*, 504 U.S. at 729.

In *Morgan*, the Court addressed a defendant's right to inquire as to a prospective juror's impartiality concerning capital sentencing in the event of a first-degree murder verdict. The concern for fundamental fairness that underlies the right to an impartial jury, and which animated the decision in *Morgan,* necessitates that a defendant be permitted

to inquire as to whether a prior conviction would prevent a prospective juror in a capital case from following the law in accord with her oath and the trial court's instructions.

*Morgan*'s rationale was that the presence of mitigating circumstances is irrelevant to a juror who automatically would impose the death penalty. The presence of mitigating circumstances similarly would be irrelevant to a juror who believes that a defendant who has a voluntary manslaughter conviction automatically must receive the death penalty. Such a juror ultimately would fail to perform his or her duties to weigh evidence neutrally and objectively in accord with the trial court's instructions and the juror's oath. A defendant's right to an impartial jury is nullified if the defendant is prohibited from identifying those potential jurors who would always impose the death penalty upon learning that the defendant already has another conviction. By barring the requested questioning at voir dire, the trial court here created a risk that at least one juror who automatically would vote to impose a sentence of death on a defendant with a prior manslaughter conviction was empaneled and acted upon those views, thereby violating Le's due process right to an impartial jury.

A multitude of jurisdictions have recognized that the right to an impartial capital jury requires voir dire that is not limited to whether the prospective juror would consider a life sentence following a first-degree murder verdict. Both federal and state courts have held that case-specific questioning of prospective jurors during voir dire is appropriate. *See, e.g., United States v. Johnson*, 366 F.Supp.2d 822, 840 (N.D. Iowa 2005) (defining "case-specific" questions as "questions that ask whether or not jurors can consider or would vote to impose a life sentence or a death sentence in a case involving stated facts, either mitigating or aggravating, that are or might be actually at issue in the case that the jurors would hear"); *see also Ellington v. State*, 735 S.E.2d 736, 750 (Ga. 2012) (holding that the trial court erred in precluding voir dire questioning of prospective jurors as to

whether they would automatically impose the death penalty, as opposed to fairly considering all of the sentencing options, in a case involving the murder of young children); *United States v. Fell*, 372 F.Supp.2d 766, 773 (D. Vt. 2005) (holding that defense counsel could ask prospective jurors whether they could fairly weigh aggravating and mitigating circumstances given the existence of certain case-specific facts, as long as the primary purpose was to ensure impartiality); *People v. Cash*, 50 P.3d 332, 342-43 (Cal. 2002) (holding that the defense should have been permitted to inquire during voir dire as to whether prospective jurors automatically would vote for the death penalty if the defendant had previously committed another murder).

In accepting Le's argument in this regard, I am persuaded by a distinction drawn by the courts in *Johnson*, *Fell*, *Ellington,* and *Cash*. *Johnson* distinguished between case-specific questions, which the court defined generally to encompass particular facts that will be at issue in the case, and "stake-out" or "pre-commitment questions," which the court defined as those seeking to commit the prospective juror to vote based upon particular facts. *Johnson*, 366 F.Supp.2d at 840. The court explained that a properly framed case-specific question would ask whether the venireperson could fairly consider sentencing options notwithstanding proof of certain facts. A stake-out question, by contrast, would ask how a prospective juror would vote at sentencing if presented with proof of certain facts. *Id.* at 845. According to the court, case-specific questions are necessary to empanel a fair and impartial jury, while stake-out questions are improper.

*Fell* also adopted this nomenclature as well, holding that there is a crucial difference between questions that seek to discover how a prospective juror might vote, and those that ask whether a prospective juror will be able to consider potential aggravating and mitigating evidence fairly (or at all). *Fell*, 372 F.Supp.2d at 771; *see also Cash*, 50 P.3d at 342 (explaining that death-qualification voir dire "must not be so abstract

that it fails to identify those jurors whose death penalty views would prevent or substantially impair the performance of their duties as jurors in the case being tried," but also "must not be so specific that it requires the prospective jurors to prejudge the penalty issue based on a summary of the mitigating and aggravating evidence likely to be presented"); *State v. Henderson*, 574 S.E.2d 700, 706 (N.C. Ct. App. 2003) (internal citation omitted) (recognizing the difference between an improper "stakeout" question and a question "designed to measure a prospective juror's ability to follow the law," which is "proper within the context of jury selection voir dire").

Similarly, the Supreme Court of Georgia acknowledged that the "line between permissible inquiry into 'prejudice' (a juror's fixed opinion that a certain result should automatically follow from some fact, regardless of other facts or legal instructions) and impermissible questions of 'pre-judgment' (speculation about or commitment to the appropriate result based on hypothesized facts) can be hazy." *Ellington*, 735 S.E.2d at 754. Regardless of where the line is, the court held that the defendant was entitled to ask whether prospective jurors "would automatically vote for a death sentence in any case in which two murder victims were young children, regardless of any other facts or legal instructions." *Id.* at 755.

In rejecting the requested voir dire question, the trial court in this case relied upon our decision in *Commonwealth v. Bomar*, 826 A.2d 831 (Pa. 2003), a case that clearly is distinguishable. In *Bomar*, the defendant argued that he was unconstitutionally restricted from asking prospective jurors about specific aggravating and mitigating circumstances that might cause them to impose the death penalty. *Id.* at 847. This Court found no instance in which Bomar attempted to ask the venirepersons questions concerning aggravating circumstances and was then denied the opportunity to do so. *Id.* The Court turned to three questions that Bomar did attempt to ask regarding mitigating

circumstances. *Id.* at 848.[3] The Court held that the particular questions Bomar attempted to ask were intended "to elicit what the jurors' reactions might be when and if [Bomar] presented certain specific types of mitigating evidence." *Id.* at 849. The questions were aimed at gauging potential mitigation strategies, rather than ensuring jury impartiality. *Id.*

In *Bomar*, this Court precluded the same types of pre-commitment or pre-judgment questions with which the courts in *Johnson, Fell, Ellington,* and *Cash* were concerned. The questions Bomar sought to ask were premised upon information that the defendant might, or might not, choose to present in mitigation. They were not case-specific questions premised upon particular facts that the prosecution would introduce as an aggravating circumstance in the sentencing phase. Unlike *Bomar*, there is no concern in this case for what the jurors' reactions "might" be upon hearing mitigation evidence presented by the defense. The jurors in this case were sure to hear evidence of Le's prior conviction, as it was going to be offered by the Commonwealth in support of aggravating circumstances. Indeed, the Commonwealth made quite clear that it sought to rely upon Le's prior conviction for voluntary manslaughter, as evidenced by its March 20, 2015 pre-trial notice of aggravating circumstances, which identified this prior conviction. The question for the prospective jurors was not how they would react to potential mitigation strategies, but whether the fact of the prior conviction would cause them to weigh that

---

[3] In particular, Bomar sought to ask the following three questions: (1) "If you were chosen as a juror in this case would you want to hear or would you consider evidence of the defendant's childhood as supported by the facts?" (2) "[S]ome mitigating circumstances may be presented by the defense. That would include the defendant's character or the defendant's record, the defendant's good deeds. Would these types of circumstances be considered by you? Would they be considered by you or would you consider them irrelevant if you had to make a decision?" (3) "Would you consider circumstances about the Defendant, if it came to a situation where we're in a sentencing hearing, would you consider, would you be able to consider circumstances about the Defendant if the judge instructed you to listen to those circumstances?" *Bomar*, 826 A.2d at 847-48.

aggravating factor to the exclusion of all other evidence, and thereby automatically impose a sentence of death.

Following *Bomar*, this Court decided *Commonwealth v. Smith*, 131 A.3d 467 (Pa. 2015).[4] There, the defendant argued that the trial court denied him due process and the right to a fair and impartial jury by refusing to permit the following voir dire question: "You will hear that [appellant] was convicted, by plea of guilty, to the crime of [v]oluntary [m]anslaughter in 1980. Is there any one of you who feels that[,] because of the defendant's prior convictions, that you would not consider a sentence of life imprisonment[?]" *Id.* at 476 (internal citations omitted).

The *Smith* Court rejected the defendant's argument, holding that the question was not permissible under *Bomar*. The Court reached this conclusion without analysis. The Court did not examine the questions barred in *Bomar* or compare those questions with the question that Smith sought to ask.

Chief Justice Saylor dissented, agreeing with Smith that the trial court erred "in refusing to allow material and appropriate life qualification questions during juror voir dire." *Id.* at 478 (Saylor, C.J., dissenting). Chief Justice Saylor agreed with Smith's reliance upon *Johnson*, and with the *Johnson* court's distinction between "1) case-specific voir dire questions designed to determine whether jurors harbor some bias relative to critical facts to be demonstrated by trial evidence, and 2) interrogatories seeking to pre-commit jurors to a particular verdict." *Id.* at 479 (citing *Johnson*, 366 F.Supp.2d at 845-49). Applying this distinction, Chief Justice Saylor explained that the rationale of *Bomar*

---

[4]     Following *Bomar*, the Court also decided *Commonwealth v. Mattison*, 82 A.3d 386 (Pa. 2013). As the Majority observes, the Court rejected the argument that the trial court abused its discretion by precluding voir dire questioning that would have disclosed the defendant's prior murder conviction. Maj. Op. at 20 n.16. In doing so, the Court did not examine the extra-jurisdictional precedent upon which Le now relies. Accordingly, this Court presently is confronted with more developed and persuasive advocacy on this issue than was available in *Mattison*.

precludes only the second type of interrogatories, and expressed a desire to "follow the lead" of the California Supreme Court in *Cash*. *Id.* (citing *Cash*, 50 P.3d 332).

I agree with the position that Chief Justice Saylor articulated in dissent in *Smith*. *Bomar* is distinguishable from the circumstances presented in *Smith*. Where the defendant seeks to uncover juror bias relative to critical facts that the Commonwealth will present, the approach embraced by the courts in *Johnson*, *Fell*, *Ellington,* and *Cash* is consistent with a fair trial before an impartial factfinder. *Smith*'s rejection of the defendant's argument undermines this constitutional guarantee. This Court should abandon *Smith* and should realign itself with fundamental constitutional precepts.[5]

The Majority declines to revisit *Smith*, based upon Le's failure to confront the *Smith* majority opinion in his brief. The Majority's evaluation of Le's argument is unduly narrow. In arguing for reversal on this issue, Le relies upon the guarantee of an impartial jury, urges this Court to distinguish *Bomar* and to examine the approach of the courts in *Johnson* and *Cash*, and relies explicitly upon Chief Justice Saylor's dissent in *Smith*. While Le does not expressly analyze the majority opinion in *Smith*, that analysis is nevertheless implicit in his adoption of Chief Justice Saylor's dissent, which demonstrated that the *Smith* majority was incorrect. More importantly, this Court is tasked with addressing the issue presented. If, in doing so, it becomes apparent that *Smith* is not supported by precedent, this Court certainly is not constrained from saying so simply

---

[5] The Majority protests that *Smith* has not proven itself to be "unworkable" or "otherwise infirm." Maj. Op. at 22, n.17. The "unworkable" and "infirm" nature of *Smith* lies in its approval of a potentially biased jury in a death penalty case. If an unconstitutional jury selection process in a death penalty case is neither "unworkable" nor "infirm," it is difficult to discern what would be.

because Le's discussion focused on the dissenting opinion in *Smith*, rather than upon the majority opinion which that dissent criticizes.[6]

Here, the Commonwealth committed to presenting evidence of Le's prior conviction. Accordingly, Le sought to voir dire potential jurors regarding this prior conviction. The trial court denied this request in reliance upon *Bomar*, a precedent that is distinguishable. Moreover, *Smith* was wrongly decided and should no longer serve as a barrier to the vindication of Pennsylvanians' fundamental right to trial by an impartial jury.

Because I would grant Le's request for a new penalty phase, I respectfully dissent.

---

[6] *See, e.g., Balentine v. Chester Water Auth.*, 191 A.3d 799, 812 (Pa. 2018) (Wecht, J., concurring) ("[A]gainst the critical importance of stability we must balance our duty as a court of last resort to refine or even abandon precedent when time and experience reveal its infirmity."); *see also Henslee v. Union Planters Nat. Bank & Trust Co.*, 335 U.S. 595, 600 (1949) (Frankfurter, J., dissenting) ("Wisdom too often never comes, and so one ought not to reject it merely because it comes late.").