STATE OF IOWA, Appellee, v. ALBERT HILLMAN, Appellant.

No. 44423.

APRIL 4, 1939.

George H. Clark and Bruce R. Clark, for appellant.

Fred D. Everett, Attorney General, and Ray G. Walter, County Attorney, for appellee.

MITCHELL, C. J.—The grand jury of the county of Ida returned an indictment accusing Albert Hillman of the crime of murder; that on the 3d day of June 1937, in the perpetration of a robbery of Clifton C. Watts, he murdered him. At the

request of the defendant the court appointed counsel to represent him. He entered a plea of not guilty. There was a trial to a jury which returned a verdict finding him guilty of the crime of manslaughter. Defendant has appealed.

Clifton C. Watts was at the time of his death 51 years of age. Since 1931 he had resided with his family consisting of his wife and four sons in the town of Arthur, Iowa, which village is located about six miles east of Ida Grove. He was a laborer engaged in road work, and employed by the Sani Construction Company, paving contractors on a project north of Holstein, Iowa.

Albert Hillman, a man of about 40 years of age, a World War veteran, resided with his family consisting of his wife and four children in Ida Grove. He was a trucker working on the same project north of Holstein, Iowa, for the Sani Construction Company, as was Clifton C. Watts. These men had been friends for years.

On the night of June 2, Hillman's truck had burned enroute from Holstein, Iowa, to Ida Grove. The next morning one of his friends helped tow the truck into town. Between ten and ten-thirty that morning he went to the Stern pool hall located in the basement of the Baxter Block, at the corner of Second and Main streets in the city of Ida Grove. The pool hall apparently was on the south side of Main street and was entered by a stairs descending from the highway at the northwest corner of the basement. The door at the foot of the stairs opened into the north or front room in which there were two pool tables. The back room opened off of the front room to the south. At the entrance to the back room there was a candy case along the east wall. Near the southwest corner of the back room was a wall case eight feet long and two feet wide. Opposite this to the east was a circular card table, and north and east thereof against the east wall was a slot machine, the only description of which is that it was known as the "one armed bandit" type operating with automatic coin pay-off.

So that the pool hall where this tragedy took place may be better understood, exhibit A, the sketch of same is inserted.

After Hillman reached the pool hall he chipped in with the proprietor and another patron and purchased a pint of

whisky. While the three men engaged in drinking the liquor they played rummy.

Clifton C. Watts on the 3d of June proceeded from Arthur to the place of his employment at Holstein. Whether he worked that morning the record does not show. About noon with a friend by the name of August Senhen he started in his car for Ida Grove. On the way to that city they stopped to see the Hillman truck, which had burned the day before. They could not find it and proceeded to Ida Grove where they looked in the garages. Watts then suggested that they go down to the pool hall, it was then about two p. m. There they met Hillman and Stern and the four of them played one game of pitch. Stern, Hillman and Watts then started playing the game known as "Black Jack", the bets being limited to $2.50 on any one hand.

The manner in which the game of "Black Jack" is played is not set out very clearly in the record or perhaps it is the inability of the writer of this opinion to understand the game but apparently it is a gambling game and with a $2.50 limit on each hand, one could easily lose or win quite a large sum of money in a few hours, and this game lasted from 2:30 to 7 p. m.

There is some dispute as to the amount of liquor consumed but they had at least three pints of whisky, one of which Watts produced.

The exact amount of money which Hillman and Watts had at the start of the game is not known but they had been paid on the day before; Watts receiving $7.18 and Hillman $42.86. Watts had somewhere around $10 and Hillman about $25; it appearing that his wife had taken $10 from his pocket early that morning without his knowledge. Some of the money was placed in front of each player and it shifted back and forth as it often does in a card game.

From three in the afternoon until seven that evening they played cards and drank whisky in the back room of this pool hall. About seven the slot machine clogged and Stern, the proprietor, quit the game in order to fix the machine that the "one armed bandit" might continue to take money from those foolish enough to play it. Hillman and Watts continued to play Black Jack.

Now for a physical description of these two men. Watts

was about 5 feet 8 or 9 inches tall, weighing between 175 and 180 pounds, rather muscular with a well developed neck, wearing a 17½ or 18 size shirt. As one witness described him, "He was a strong vigorous man."

Hillman was 5 feet 9 inches tall, weighing 170 pounds and also rather muscular. Thus we see that the two men were about the same size, weight and in the same physical condition.

Watts had a 21 jewel Hamilton watch that plays a part in this case. He carried it on a leather strap which was attached to his overalls and the watch placed in a pocket on the bib of the overall. There is only one witness who saw the watch on the third day of June, and according to his testimony it was around 12 o'clock and in the town of Holstein. It must be remembered that it was two and one-half hours later that Watts entered the pool hall and no one knows where the watch was during that time. No one saw it in the pool hall.

Now for the story of the last hour before Watts was found dead.

Hillman, Stern and Watts had played cards up until about 6 or 6:30. There had been spectators that watched them all afternoon, they testify to the drinking, but no one says they were intoxicated although the amount of liquor consumed was so large that they must have felt the effects of the whisky. Following Stern's retirement from the game, Watts and Hillman continued to play. There was no trouble between these two men. True there was a discussion over what is referred to as a "split hand" but they did not become angry and the game continued.

About seven o'clock Stern said he was going to the "Tavern", an eating place, to get some supper. Hillman said he would take care of the pool hall and both Watts and Hillman asked Stern to bring them a lunch.

At the time Stern left the pool hall the following people were known to be there, John Neumeyer, Ray Fletcher, Albert Hillman and Clifton Watts. About twenty minutes after Stern left, Neumeyer left. He had been told by Hillman to have Stern bring him three sandwiches. During this twenty minutes the game continued in a friendly manner.

We come now to the testimony of Ray Fletcher, who was the last man aside from accused who saw Clifton C. Watts alive. He testified that the game continued and that at the

time he left the pool hall Watts and Hillman were still playing. Fletcher went up the stairs, spoke to someone for a moment and then started across the street and before he had gotten across the street Albert Hillman joined him and walked to the "Tavern" where they had a lunch.

We quote from his testimony:

"Q. From the time you left Mr. Hillman and up to the time he caught up with you there, would that have been more than a minute and a half? A. No, I don't think it. could have been."

And so we find that if Albert Hillman is guilty, the offense was committed in that minute and a half.

At the "Tavern" Fletcher and Hillman met Stern. According to Stern he had no conversation at that time with Hillman.

Stern returned directly from the "Tavern" to his pool hall, arriving about 7:40 p. m. He went down the stairs through the front room into the back room.

We quote from his testimony:

"Q. What condition did, you find when you arrived at the pool-room? A. I found Mr. Watts lying on the floor, with his feet to the west, in front of the candy case. His feet were probably a couple of feet from the slot-machine and the slot-machine would have been to the east of him. He was lying on his back, his arms and hands were laying straight to his sides, his feet were extended. There were no other persons in the hall.

"Q. What did you do? A. Well, I examined him, and I took hold of his arm and apparently he was dead. I was not a judge of that. I felt his pulse and listened for heart beats and didn't find any and I got right up and went for an officer. Saw Mr. (Ed.) Lampe, and asked him if he would stay until I got an officer.

"Q. Did you notice at that time whether or not there was a cap under Mr. Watt's head as he was lying there on the floor? A. Well, no, I didn't notice that in particular, although I think it was. I asked Ed Lampe to stay at the hall until I returned. I found Barney Hamann, the night watch, a police officer here in Ida Grove, and returned to the (pool) hall with him."

The record shows that there was no watch found on the body of Watts, that he had a billfold but there was no money in it. There were some keys and small change on the card table. The sheriff and county coroner were called and arrived at the pool hall shortly thereafter.

Dr. T. J. Houlihan, a practicing physician and surgeon, was also called and examined the body. He found that Watts had a fracture of the fifth and sixth cervical vertebra and later performed a partial post mortem which showed that the spinal cord was severed almost completely.

About eleven that evening the sheriff and coroner went to Hillman's home, awakened him and informed him of Watts' death. They made arrangements with Hillman to meet them at the county attorney's office at 9 a. m. the morning of the fourth of June.

Hillman went to the county attorney's office the next morning and in the presence of the county attorney, sheriff and coroner related his activities of the day before.

At 1 a. m. on the morning of June 5th, three state agents and the county attorney went to Hillman's house, awakened him and asked him to go to the county attorney's office, which he did and he was examined until about three or four in the morning. He signed a statement in which he said that he decided to go out to eat and that Watts was along side of him and was in his way and that he struck him with his elbow and that Watts fell over into a chair. At the trial Hillman took the witness stand and said that he did not strike Watts but pushed him aside.

It was the theory of the State that Hillman was behind Watts and placed his arm around Watts neck, applying force enough to break the neck and sever the spinal cord.

. This is a criminal case and the burden of establishing guilt at every stage of the trial is, under the law, placed upon the State.

 The State relies entirely on the testimony of one witness, Dr. Houlihan.

We quote from the abstract:

''Q. .Doctor, could the force be applied to a man from the rear, by another man in a manner that would produce such an injury as was disclosed on the neck and body of Watts?

"Mr. Clark: Objected to as being incompetent, irrelevant and immaterial, not a proper hypothetical question, not being based upon any evidence introduced at this trial.

"The Court: Answer.

"Defendant excepts.

"A. Yes, I think a man's neck could be fractured by force applied by another person.

"Q. Doctor, if I was standing in front of this slot machine in this manner and had my hand on this lever, and had inserted a coin in the machine, could a force be applied to my person by another man from the rear that would cause such an injury as was sustained and disclosed in the examination of Watts? A. It could be applied, yes.

"Q. Will you demonstrate the manner in which such a force could be applied?

"Mr. Clark: Objected to as being incompetent, irrelevant and immaterial, prejudicial, being done only for the purpose of prejudicing the minds of the Jury, the demonstration not accurate at the trial, and no evidence, that the demonstration could be performed before the jury, grandstanding.

"The Court: Proceed.

"Defendant excepts.

"A. Well, the so-called strangle hold, which of course is barred in all wrestling matches, may break the neck if it is applied strong enough such as this (illustrating hold on Mr. Walter) may fracture anybody's neck."

If this testimony was not admissible the State's case would fail, which shows how prejudicial it was, if it was erroneously admitted.

The undisputed record shows that there were no marks, scratches, bruises or wounds on Watt's neck or head or the entire body.

There is no evidence supporting the fact that the defendant touched the body of the deceased either in life or death with his hands, the only physical contact was what the defendant testified to, that he pushed or shoved him with his elbow.

There is no evidence that defendant was behind the deceased or applied any force.

There is no evidence that Watts at any time was standing in front of the slot machine with his hand on the lever.

There is no evidence that the defendant approached or attacked the deceased from the rear.

There is no evidence that there was any struggle, quarrel or fight between the deceased and the defendant.

There is no evidence that the defendant was a wrestler, or that he applied the "Strangle Hold" or any other hold to the body of Watts.

The State in order to justify the admission of this testimony cites certain cases. State v. Morphy, 33 Iowa 270, 11 Am. Rep. 122. In that case there was a wound on the head and from the nature of same the doctor was permitted to testify that it was caused by a sharp metal instrument. In the case at bar there were no scratches, cuts, bruises or wounds upon which to base the answer to the question.

In the case of State v. Korth, 204 Iowa 1360, 217 N. W. 236, relied on by the appellee, on examination by the witness, a physician, morphine poison was found in the body and of course a physician from this examination was able to state the cause of the death.

In State v. Guidice, 170 Iowa 731, 153 N. W. 336, Ann. Cas. 1917C, 1160, the witness, a physician, examined the deceased and found a cut on the throat. From his examination he was permitted to testify that a sharp instrument was used.

In State v. Hessenius, 165 Iowa 415, 424, 146 N. W. 58, 62, L. R. A. 1915A, 1078, this court said:

"The theory upon which the testimony of expert witnesses has been held admissible in certain cases is that the subject-matter of the particular inquiry is so peculiarly within the range of scientific knowledge or special training that to exclude it would work a denial of the only proof competent to establish the fact."

We have no fault to find with the cases cited by the State but we do not believe that the case at bar is controlled by them.

The best answer that "the subject-matter of the particular inquiry was not within the range of the scientific knowledge or special training" of the witness, was given by Dr. Houlihan himself. We quote from his evidence:

"Q. The only way you think then that neck could be broken would be by a very strong force being applied as you

demonstrated on the neck and so forth as you indicated? A. Oh, no, I don't think that's the only way you can break a neck.

"Q. Well, that's just one way you can break the neck? A. Yes."

So we find that Dr. Houlihan himself from his scientific knowledge and special training could not tell the manner in which Watt's neck was broken. In addition to this there is the testimony of Dr. Parker, a physician and surgeon of training and experience, who testified that the injury which Watts died from could have been caused by a fall.

In view of this record, that Watts and Hillman had been friends for years; that there was no quarrel; that they were men of about the same size and weight; that no one testifies to any struggle between the two; that they were left alone together for only about a minute and a half; that there was no evidence upon which to base the hypothetical question answered by Doctor Houlihan; that there was no scratch, bruise, cut or wound on the neck or body of Watts, it seems to us that the evidence above set out should not have been admitted.

Other questions are raised but we do not find it necessary to pass upon them.

For the error in the admission of the testimony, this case must be and it is reversed.—Reversed.

SAGER, STIGER, OLIVER, HALE, BLISS, and MILLER, JJ., concur.